ADASKIN-TILLEY FURNITURE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5530.    Promulgated February 26, 1927.

Petitioner and Flint-Adaskin Co. were not affiliated during 1920.

*Roger T. Clapp, Esq.*, and *Frederick W. Tillinghast, Esq.*, for the petitioner.

*M. N. Fisher, Esq.*, for the respondent.

This is a proceeding for the redetermination of a deficiency of $2,611.21 in income and profits tax for 1920. The question presented is whether the petitioner and the Flint-Adaskin Furniture Co. were affiliated during 1920.

FINDINGS OF FACT.

Herman Adaskin, merchant and resident of Springfield, Mass., conceived the idea of a chain of retail furniture stores. His initial step in establishing the chain was the purchase of the assets and business of John Tilley & Co., in Holyoke, Mass. On September 8, 1919, he incorporated this business, under the laws of Massachusetts, as the Adaskin-Tilley Furniture Co., Tilley being treasurer and a stockholder of the new corporation. Adaskin exchanged the assets which he had purchased for all of the stock of the corporation, consisting of 1,500 shares of preferred and 1,000 shares of common stock. Only the common stock had voting rights. Adaskin raised additional capital by selling the preferred stock, giving some common stock as a bonus, but retaining the majority of the common stock to assure himself of control of the corporation.

On December 5, 1919, the Flint-Adaskin Furniture Co., a Rhode Island corporation, was organized to operate a retail furniture business in Providence, R. I. This corporation, the second unit in Adaskin's chain, was organized to take over the assets and business of Flint & Co., Inc., and the Anthony Furniture Co., both doing

business in Providence. Adaskin was issued all the preferred stock amounting to 1,155 shares, and 1,306 out of 2,381 shares of the common stock. As in the case of the petitioner, voting rights were limited to the common stock. The preferred stock was sold to raise additional capital, Adaskin retaining sufficient common stock to have a majority.

Adaskin added additional units to his chain by establishing stores at New Haven, Conn., two at Fall River, Mass., an additional store in Holyoke, Mass., and one at Worcester, Mass. These stores were all acquired by the Adaskin system, which has been outlined as to the Adaskin-Tilley and the Flint-Adaskin companies, which are the only companies here involved. In acquiring each of his units, Adaskin agreed to purchase only upon condition that he should have explicit control of every phase of the business. If a preliminary understanding of this nature was not obtainable, Adaskin would cease negotiations for the business.

From the beginning of the two corporations in question Adaskin inaugurated an entirely different policy of doing business. He installed standardized forms, equipment, and methods of selling, buying and delivery. A new accounting system was installed so that books and records would be kept the same in each store. He increased advertising, placed floor men in each store to direct the customers to the different departments, placed his salesmen on a commission basis, dictated the lines of merchandise to be carried and the amounts, approved or rejected lines of merchandise suggested by the buyers of the store, compared the monthly statements of the store managers, and checked up on discrepancies either as to store, department or personnel. He insisted on interchange of merchandise and trade acceptances; he named the officers and directors, arranged for loans from the bank and credits from the factories. He was president of both companies.

The stockholders and directors have never disputed or objected to the policies of Adaskin or his methods of conducting the business. There were no rival factions or dissenting stockholders. At only one meeting, and that a meeting of the Adaskin-Tilley Co., was there a stockholder present in addition to the necessary quorum. The stockholders' meetings merely elected directors and approved the acts of the directors. Proxies were sent out with the notices of annual stockholders' meetings, and these proxies were usually returned to Adaskin or Richard E. Smith. Smith was general manager of the Flint-Adaskin Co., and never objected to Adaskin's business policies or methods. He had been president and general manager of Flint & Co., Inc., and was the largest stockholder in the new corporation with the exception of Adaskin.

The common stock of the petitioner outstanding during 1920 was 1,000 shares. The common stock of the Flint-Adaskin Co. outstanding on January 1, 1920, was 2,401 shares, and on December 31, 1920, 2,413 shares. The following table shows the shares held by the principal stockholders, the changes during the year, and the percentage of holdings to the total outstanding capital stock.

| Stockholder. | Year 1920. | Adaskin-Tilley Co. | | Flint-Adaskin Co. | |
|---|---|---|---|---|---|
| | | Shares. | Per cent. | Shares. | Per cent. |
| H. Adaskin | Jan. 1 | 884 | 88.4 | 1,256 | 52.3 |
| | Dec. 31 | 864 | 86.4 | 1,233 | 51.1 |
| T. P. Tilley | Jan. 1 | 40 | 4 | 50 | 2 |
| | Dec. 31 | 40 | 4 | 50 | 2 |
| Richard E. Smith | Jan. 1 | | | 532 | 22.1 |
| | Dec. 31 | | | 532 | 22 |
| J. Palmer Barstow | Jan. 1 | | | 333 | 13.9 |
| | Dec. 31 | | | 333 | 13.8 |
| Others | Jan. 1 | 76 | 7.6 | 230 | 9.7 |
| | Dec. 31 | 96 | 9.6 | 265 | 11 |

J. Palmer Barstow was treasurer of the Flint-Adaskin Co. Ninety-nine and 87 shares of that company were held as treasury stock on January 1 and December 31, 1920, respectively.

The petitioner and the Flint-Adaskin Co. filed a consolidated return for 1920 in which a loss sustained by the latter company was taken as a deduction, and the capital items referable to that company were included in invested capital. The Commissioner determined that the companies were not affiliated, denied the loss claimed, and eliminated the capital items of the Providence company from petitioner's invested capital.

OPINION.

MORRIS: Section 240 (b) of the Revenue Act of 1918 provides in part that two or more corporations shall be deemed to be affiliated if substantially all of the stock is owned or controlled by the same interests. In the present case, Adaskin and Tilley owned 90.4 per cent in the petitioner and 53.1 per cent in the Providence company during 1920. These percentages standing alone would not be sufficient to meet the requirement of " substantially all " laid down by the statute. *Appeals of United Metal Spinning Co.*, 2 B. T. A. 520; *Rishell Phonograph Co.*, 2 B. T. A. 229. The petitioner, however, contends that, in addition to the stock owned outright by Adaskin and Tilley, the former controlled all of the minority stock of both companies. If, as a matter of fact, he controlled such additional stock, there would be no question that substantially all of the stock was owned or controlled by the same interests.

There is no doubt but that Adaskin had absolute control of the business methods, policies and relations of the two corporations. He dominated and managed the business of each. He settled questions of policy, expediency and methods of operation. He organized both corporations with the understanding that he should have control of the business. We have heretofore held, however, in the *Appeal of Canyon Lumber Co.*, 1 B. T. A. 473, that the control "referred to in the statute, whether it be legal or otherwise, means control of the voting rights of stock." We further held in the *Appeal of Watson-town Brick Co.*, 3 B. T. A. 85, that "control of the business is not control of the stock of a corporation conducting a business, nor, where a minority of stockholders are present, even though quiescent, representing 27.04 per cent of the stock, can we hold that the stock owned or controlled by the parent company constitutes substantially all of such stock." In the *Appeal of Rishell Phonograph Co.*, *supra*, we used the following language:

It is obvious that the two corporations constituted a single economic unit with an arbitrary assignment of profits to the phonograph company, which in fact employed no capital and was practically nothing but an order-soliciting department of the furniture company. But this alone is not necessarily sufficient to bring the corporations within the provisions of section 240 (b) of the Revenue Act of 1918.

The petitioner attempts to show control of the voting stock by the facts that Smith and Barstow, the owners of approximately 22 and 14 per cent, respectively, of the stock of the Flint-Adaskin Co., were subject to discharge without notice by Adaskin, that Smith and Barstow had worked harmoniously and had never interfered or objected to the business policies or methods of Adaskin, and that the minority stockholders, other than Smith or Barstow, never attended stockholders' meetings or attempted to exercise their right to vote other than by certain proxies made out in favor of Adaskin and Smith. The fact that the stockholders worked harmoniously does not establish control of the stock of one by the other. *Appeal of Sutherland Manufacturing Co.*, 3 B. T. A. 1224.

Barstow and Smith, who together owned approximately 36 per cent of the stock of the Flint-Adaskin Furniture Co., owned no stock in the petitioner and there is no showing that the other minority stockholders, owning 10 per cent additional, had any interest therein. To hold upon such facts that Adaskin controlled that stock by reason of his control of the business through a majority stockholding would, in our opinion, lead to the inevitable conclusion that a bare majority stock holding, or even less than a majority, where the ownership is widely scattered, brings about an affiliation, a result which is inconsistent with the express wording of the statute that there must be

ownership or control of substantially all the stock.  *Appeal of Tunnel Railroad of St. Louis*, 4 B. T. A. 596.

The petitioner relies chiefly upon three decisions of the Board, namely, *Appeals of Monroe Furniture Co.*, 2 B. T. A. 743; *Midland Refining Co.*, 2 B. T. A. 292, and *Mahoning Coal Railroad Co.*, 4 B. T. A. 923.  These cases are clearly distinguishable.  In the first-named case, the same stockholders owned in excess of 90 per cent of the stock of two of the corporations involved and approximately 80 per cent of the other two.  In the *Midland* case, fifteen stockholders owned stock in both companies, their holdings amounting to approximately 80 per cent of both.  In addition to the ownership of stock by the parent company in the *Mahoning Coal Railroad Co.* case in excess of 58 per cent and by the parent company and its officers and stockholders of 74 to 80 per cent, there were additional factors which influenced the decision in that case which are not present in the instant case.

*Judgment will be entered for the respondent.*