GREAT NORTHERN RAILWAY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 8433, 11850.   Promulgated September 22, 1927.

1. In its income-tax return for 1917 the petitioner deducted from gross income the entire expense of operating its transportation service trains, including $422,677.80 appearing upon its books as a credit to " Transportation for Investment-Cr.," and representing the estimated cost of transporting on such trains men engaged in and material used in construction work, which deduction was disallowed by the Commissioner. A revised estimate of such cost is $41,799.45. *Held*, on the evidence, that no part of the $422,677.80 is deductible from gross income.

2. In 1917 the petitioner paid $4,587.02 as penalties for violating Federal regulatory statutes. *Held*, that the penalties paid are not ordinary and necessary expenses incident to the conduct of its business.

3. In 1918 the petitioner owned all of the capital stock of the Great Northern Express Co., an affiliated corporation. During the year the Express Company was required by the Customs authorities to pay a penalty of $28 for violation of the Customs Regulations, one-half of which was assumed by the Great Northern Express Company and the other half by the Adams Express Company. *Held*, that the penalty paid was not a legal deduction from gross income.

4. During the years 1917, 1918, and 1919 the petitioner owned interest-bearing obligations of a number of corporations which, under the Regulations of the Interstate Commerce Commission, it was not permitted to accrue upon its books for the reason that the corporations were operating at a deficit and there was no certainty that they would ever be able to pay interest on their obligations. *Held*, that the petitioner derived no income from interest upon the obligations during the taxable years and that the amount thereof was improperly accrued by the respondent in computing deficiencies.

5. In determining the cost of property scrapped during the taxable years the Commissioner correctly adjusted the March 1, 1913, value by the amount of allowable depreciation on such assets which was deducted from gross income in income-tax returns.

6. Amount of loss sustained on shares of stock of the Spokane & Inland Empire Railroad Co. which became worthless in 1918, determined.

7. Profit on sale of parcels of land determined.

8. Contributions received for construction of spur tracks and farm crossings held not to constitute taxable income.

9. Compensation and interest due the petitioner from the Director General was income for each of the accounting periods for which the compensation was allowed. *Appeal of Illinois Terminal Co.*, 5 B. T. A. 15, followed.

10. The petitioner and the Farmers Grain & Shipping Co. *held* not to be affiliated.

11. One of the subsidiaries of the petitioner entered into a contract in 1918 for the sale of a steamship at the price of $600,000. No part of the purchase price was received in 1918 and $200,000 was paid in 1919, during which year the contract was canceled and the subsidiary permitted to retain the $200,000 paid on account. *Held*, that the $200,000 received was income of 1919.

12. Under the Federal Control Act and the Revenue Act of 1918 the petitioner was required to pay income taxes at the rate of 10 per cent for 1918 and 8 per cent for 1919. These statutes release the petitioner from liability for two-twelfths of the taxes that would otherwise be due from it for the year 1918 and two-tenths of the taxes due for the year 1919. The additional taxes due for those years are assessable against the petitioner at the rates of 10 per cent and 8 per cent, respectively. *Appeal of New York, Ontario & Western Railway Co.*, 1 B. T. A. 1172, followed.

13. Deductible amount of depreciation on ore docks for 1918 and 1919 determined.

14. In 1919 the petitioner made a contribution to the "Association of Railway Executives" which it is alleged by the respondent is not deductible from gross income in its income-tax return for 1919. For lack of evidence as to whether the amount was taken as a deduction in the return, *held* that the net income of the petitioner should not be increased by any disallowance of the contribution.

*J. P. Plunkett, Esq.*, and *F. G. Dorety, Esq.*, for the petitioner.
*M. N. Fisher, Esq.*, for the respondent.

These are proceedings for the redetermination of deficiencies in income tax for the years 1917, 1918, and 1919 as follows:

| | |
|---|---:|
| 1917 | $121,149.59 |
| 1918 | 529,249.86 |
| 1919 | 26,643.55 |

The petitioner alleges that the taxes in controversy for the several years are as follows:

| | |
|---|---:|
| 1917 | $130,056.13 |
| 1918 | 536,739.06 |
| 1919 | 32,030.40 |

The assignments of error with respect to the year 1917 are as follows:

1. The failure of the Commissioner to allow as a deduction from the gross income of the taxpayer ordinary and necessary expenses incurred, in the amount of $422,677.80, said failure resulting in proposed additional taxes of $25,360.67.

2. The failure of the Commissioner to allow as a deduction from the gross income of the taxpayer the sum of $4,587.02 paid to the United States Government as fines for the violation of Federal Statutes and Regulations, such failure resulting in proposed additional taxes of $275.22.

3. The error of the Commissioner in determining that interest to the amount of $1,572,100.07, due the taxpayer for the year 1917, but not received or accrued on its books, on interest-bearing obligations of the Spokane, Portland and Seattle Railway Company held by the taxpayer, constituted taxable income of the taxpayer for that year, such error resulting in proposed additional taxes of $94,326.00.

4. The error of the Commissioner in determining that interest to the amount of $29,558.61 due the taxpayer for the year 1917, but never received or accrued on its books, on advances made to the Glacier Park Hotel Company by the taxpayer, constituted taxable income of the taxpayer for that year, such error resulting in proposed additional taxes of $1,773.52.

5. The error of the Commissioner in determining that interest to the amount of $3,518.97 due the taxpayer for the year 1917, but never received or accrued on its books, on advances made to the South Butte Mining Company by the taxpayer, constituted taxable income of the taxpayer for that year, such error resulting in proposed additional taxes of $211.14.

6. The error of the Commissioner in determining that interest to the amount of $90,000.00, due the taxpayer for the year 1917, but never received or accrued

on its books, on notes of the Washington & Great Northern Townsite Company held by the taxpayer, also interest on unpaid installments of interest on such notes, amounting to $14,085.58, likewise never received or accrued on the taxpayer's books, constituted taxable income of the taxpayer for that year, such error resulting in proposed additional taxes of $6,245.13.

7. The failure of the Commissioner to allow as a basis of deduction from the gross income of the taxpayer, the fair market value as of March 1, 1913, of certain equipment acquired by the taxpayer prior to March 1, 1913, and scrapped or otherwise disposed of during the year 1917, such failure resulting in excess taxes for the year of $1,864.45.

The assignments of error for the years 1918 and 1919 are as follows:

1. The failure of the Commissioner to find that capital stock of the Spokane and Inland Empire Railroad Company, held by taxpayer and ascertained to be worthless in the year 1918, had a value on March 1, 1913, equal to the cost thereof, and his failure to use such value as a basis of ascertaining the loss sustained, such failure resulting in proposed additional taxes of $216,689.70.

2. The failure of the Commissioner to find that certain parcels of land, sold by the taxpayer in 1918, had a value on March 1, 1913, in excess of cost and equal to the selling price received in 1918, and his failure to use such value as a basis of ascertaining gain or loss, such failure resulting in proposed additional taxes of $274.59.

3. The error of the Commissioner in determining that interest due the taxpayer for the years 1918 and 1919, but never received or accrued on its books, on interest-bearing obligations of the Spokane, Portland and Seattle Railway Company held by the taxpayer, constituted taxable income of the taxpayer for those years, such error resulting in proposed additional taxes of $151,978.47 for the year 1918 and $121,458.17 for the year 1919.

4. The error of the Commissioner in determining that the value of labor and material furnished, free, by various individuals and corporations, and of cash reimbursements made by such individuals and corporations during the years 1918 and 1919 in connection with the construction of private and public crossings, industry spur tracks and other facilities under agreements providing that the title to such facilities would be in the taxpayer, constituted taxable income of the taxpayer, for those years, such error resulting in proposed additional taxes of $2,811.60 for the year 1918 and $1,530.32 for the year 1919.

5. The error of the Commissioner in reducing the taxable income of the taxpayer for each of the years 1918 and 1919 in the amount of $53,635.77, to agree with a certificate issued by the Interstate Commerce Commission under date of January 5, 1922, reducing the annual compensation of the taxpayer under the Federal Control Act in that amount, such error resulting in proposed reduction of taxes for the year 1918 of $5,363.58 and for the year 1919 of $4,290.86 and in proposed additional taxes for the year 1921 of $10,727.15.

6. The error of the Commissioner in determining that the taxable income of the taxpayer for the year 1918 should be increased in the sum of $693,005.39 and that the taxable income for the year 1919 should be decreased in the sum of $1,218,434.89 in order that the account representing interest due from the Director General of Railroads for those years might correspond with what is alleged to have been allowed by the Director General in final settlement, such error resulting in proposed additional taxes for the year 1918 of $69,300.54, in proposed reduced taxes for the year 1919 of $97,474.79, and proposed additional taxes for the year 1921 of $52,542.95.

7. The refusal of the Commissioner to permit the taxpayer and the Farmers Grain and Shipping Company to file a consolidated income tax return for the years 1918 and 1919 and his error in determining that interest due the Brandon, Devils Lake and Southern Railway Company, a corporation, affiliated with the taxpayer, for the years 1918 and 1919, but never received or accrued on its books, on bonds of the Farmers Grain and Shipping Company held by the Brandon, Devils Lake and Southern Railway Company, constituted taxable income of the taxpayer for those years, such error resulting in proposed additional taxes of $2,628.00 for the year 1918 and $2,190.00 for the year 1919.

8. The failure of the Commissioner to allow as a deduction from the gross income of the Great Northern Express Company, a corporation affiliated with the taxpayer, in the year 1918, the amount paid to the U. S. Government in that year as a fine for the violation of a customs regulation, such failure resulting in proposed additional taxes of $1.68.

9. The error of the Commissioner in determining that the Northern Steamship Company, a corporation affiliated with the taxpayer, had sold its steamship "Northland" to the Davie Shipbuilding and Repair Company in 1918 at a profit of $65,207.13, and in increasing the taxable income of the taxpayer for the year 1918 in that amount, such error resulting in proposed additional taxes for that year of $7,824.85 and in a proposed reduction of taxes for the year 1919 of $2,173.57.

10. The error of the Commissioner in increasing the taxable income of the Duluth and Superior Bridge Company, a corporation affiliated with the taxpayer, for each of the years 1918 and 1919 in the sum of $325.00 to agree with a certificate issued by the Interstate Commerce Commission under date of May 4, 1921, increasing the annual compensation of that company under the Federal Control Act in that amount, such error resulting in proposed additional taxes for the year 1918 of $32.50 and for the year 1919 of $26.00, and in a proposed reduction in taxes for the year 1921 of $65.00.

11. The error of the Commissioner in reducing the taxable income of the Duluth Terminal Railway Company, a corporation affiliated with the taxpayer, for each of the years 1918 and 1919 in the sum of $16,068.00, to agree with a certificate issued by the Interstate Commerce Commission under date of May 4, 1921, reducing the annual compensation of that company under the Federal Control Act in that amount, such error resulting in a proposed reduction in the taxes for the year 1918 of $1,606.80 and for the year 1919 of $1,285.44, and in proposed additional taxes for the year 1921 of $3,213.60.

12. The error of the Commissioner in reducing the taxable income of the Watertown and Sioux Falls Railway Company, a corporation affiliated with the taxpayer, for each of the years 1918 and 1919 in the sum of $21,115.08, to agree with a certificate issued by the Interstate Commerce Commission under date of September 12, 1921, reducing the annual compensation of that company under the Federal Control Act in that amount, such error resulting in a proposed reduction in the taxes for the year 1918 of $2,111.51, for the year 1919 of $1,689.21 and in proposed additional taxes for the year 1921 of $4,223.02.

13. The error of the Commissioner in computing the additional tax due from the taxpayer for the year 1918 at the rate of 12 per cent. instead of 10 per cent. and for the year 1919 at the rate of 10 per cent. instead of 8 per cent. such error resulting in proposed additional taxes for the year 1918 of $88,118.33 and for the year 1919 of $4,745.39.

14. The failure of the Commissioner to allow as a basis of deduction from the gross income of the taxpayer for the years 1918 and 1919, the fair market value as of March 1, 1913, of certain equipment acquired by the taxpayer prior

to March 1, 1913, and the cost of certain equipment acquired by the taxpayer subsequent to February 28, 1913, and scrapped or otherwise disposed of during the years 1918 and 1919, such failure resulting in excess taxes for the year 1918 of $5,130.85 and for the year 1919 for $3,038.50.

15. The failure of the Commissioner to allow as a basis of deduction from the gross income of the Glacier Park Hotel Company, a corporation affiliated with the taxpayer, for the year 1919, the cost of 28 row boats acquired by the Glacier Park Hotel Company subsequent to February 28, 1913, and destroyed during the year 1919, such failure resulting in excess taxes of $54.08.

16. The failure of the Commissioner to allow as a basis of deduction from the gross income of the Cottonwood Coal Company, a corporation affiliated with the taxpayer, for the years 1918 and 1919, the cost of certain buildings and other facilities acquired by the Cottonwood Coal Company subsequent to February 28, 1913, and destroyed during the years 1918 and 1919, such failure resulting in excess taxes of $9.00 for the year 1918 and $16.07 for the year 1919.

17. The failure of the Commissioner to allow as a basis of deduction from the gross income of the Somers Lumber Company, a corporation affiliated with the taxpayer, for the years 1918 and 1919, the fair market value as of March 1, 1913, of various facilities acquired by the Somers Lumber Company prior to March 1, 1913, and the cost of various facilities acquired by the Somers Lumber Company subsequent to February 28, 1913, and scrapped or otherwise disposed of during the years 1918 and 1919, such failure resulting in excess taxes of $20.84 for the year 1918 and $5,885.74 for the year 1919.

Upon leave being granted, the petitioner amended its petition on December 13, 1926, by adding the following assignment of error, to wit:

18. The failure of the Commissioner to allow as a deduction from the gross income of the taxpayer for the years 1918 and 1919, depreciation on ore dock property of the taxpayer at Alloucz Bay, Wisconsin, such failure resulting in excess taxes of $18,868.64 for the year 1918 and of $15,094.91 for the year 1919.

The answer of the Commissioner was filed April 14, 1926, alleging as new matter the following:

19. Alleges that there was erroneously allowed as a deduction from gross income an amount of $17,985.57 for 1919 which represented the proportion of the Great Northern Railway Company and its subsidiaries of an assessment levied by the Association of Railway Executives for the promoting of railway legislation.

At the hearing before the Board on December 13–15, 1926, the appeals were consolidated and tried as one case.

FINDINGS OF FACT.

1. The petitioner is a Minnesota corporation with its principal office at St. Paul.

2. The petitioner is a common carrier engaged in the transportation of passengers and freight by steam railroad and as such is under the control of the Interstate Commerce Commission.

3. In pursuance of the provisions of the Interstate Commerce Act the Interstate Commerce Commission prescribed a uniform system of accounts to be observed by carriers subject to the Act. Said uniform system of accounts is comprised in part of three classifications issued by the Commission, effective July 1, 1914, namely:

Classification of investment in road and equipment of steam roads.
Classification of income, profit and loss and general balance sheet accounts for steam roads.
Classification of operating revenues and operating expenses of steam roads.

4. Petitioner's accounts for the years 1917, 1918, and 1919 were kept in accordance with said uniform system of accounts.

5. Petitioner's income-tax returns for the years 1917, 1918, and 1919 were made upon the basis upon which its accounts were kept.

6. During the years 1918 and 1919 the petitioner was affiliated with the following corporations and filed consolidated income-tax returns for itself and such corporations and paid the taxes assessed upon such consolidated returns:

Brandon, Devils Lake & Southern Railway Co.
Great Northern Express Co.
Northern Steamship Co.
Duluth & Superior Bridge Co.
Duluth Terminal Railway Co.
Watertown & Sioux Falls Railway Co.
Glacier Park Hotel Co.
Cottonwood Coal Co.
Somers Lumber Co.
Allouez Bay Dock Co.
Billings & Northern Railroad Co.
Columbia & Red Mountain Railway Co.
Dakota & Great Northern Railway Co.
Duluth, Mississippi River & Northern Railroad Co.
Duluth, Superior & Western Railway Co.
Duluth, Watertown & Pacific Railway Co.
Eastern Railway Co. of Minnesota.
Great Northern Office Building Co.
Minneapolis Union Railway Co.
Minnesota & Great Northern Railway Co.
Montana Central Railway Co.
Park Rapids & Leech Lake Railway Co.
St. Paul, Minneapolis & Manitoba Railway Co.
Seattle & Montana Railroad Co.
Spokane Falls & Northern Railway Co.
Washington & Great Northern Railway Co.
Willmar & Sioux Falls Railway Co.
Dakota & Great Northern Townsite Co.
Skagit Coal & Coke Co.
Cholan Electric Co.
Northern Land Co.
Great Northern Steamship Co.
Washington & Great Northern Townsite Co.

*Transportation for Investment—Cr.*

7. The " classification of investment in road and equipment," prescribed by the Interstate Commerce Commission, contained the following instructions:

*Cost of Construction.*—It is intended that the accounts for fixed improvements and equipment shall include the cost of construction of such property. The cost of construction shall include the cost of labor, materials and supplies, work-train service, special machine service, transportation, contract work, protection from casualties, injuries and damages, privileges, and other analogous elements in connection with such work. The several items of cost here referred to are defined as follows:

Cost of Transportation includes the amounts paid to other companies or individuals for the transportation of men, materials and supplies, special machine outfits, appliances, and tools in connection with construction. Freight charges paid foreign lines for the transportation of construction material to the carrier's line shall be included, so far as practicable, as a part of the cost of the material, when such charges are borne by the carrier. A fair allowance representing the expense to the carrier of such transportation in transportation service trains over the carrier's own line also shall be included. When the cost of such transportation is not assignable to specific work, it shall be included in account No. 43, " Other expenditures—Road." Amounts thus charged for transportation service over the carrier's line shall be credited to operating expense general account VIII, Transportation for Investment—Cr.

8. The " classification of operating revenues and operating expenses," prescribed by the Interstate Commerce Commission, contained the following instructions:

General Account VIII, Transportation for Investment—Cr.

This account shall include fair allowances representing the expense to the carrier of transporting in transportation service trains men engaged in and material used for construction. Amounts credited to this account shall be concurrently charged to the appropriate property investment accounts.

9. In compliance with the foregoing instructions of the Interstate Commerce Commission, the petitioner made entries on its books in and for the year 1917 charging to its investment account and crediting to the account " Transportation for Investment—Cr." under operating expenses the sum of $422,677.80, representing the expense to the petitioner of transporting in its transportation service trains, men engaged in, and material used for construction purposes. Of this amount, $32,219.12 represented the expense of transporting men, computed at the rate of one cent per man per mile, and $390,458.68 represented material, computed at the rate of six mills per ton mile.

10. The number of men transported for construction purposes on petitioner's transportation service trains during the year 1917 was the equivalent of 3,220,609 men one mile. These men were car-

ried on the ordinary passenger trains operated by the petitioner. No extra trains were run to carry them, no extra cars were put on the passenger trains to accommodate them and no extra service was performed for them. They averaged approximately one man to every four passenger trains and constituted approximately .48 of 1 per cent of the total passengers carried on such trains. At all times many more passengers could have been carried on such trains without increasing the number of trains or cars run.

11. The quantity of material transported for construction purposes on petitioner's transportation-service trains during the year 1917 was the equivalent of 65,076,446 ton-miles. This material was carried on the ordinary freight trains, operated by the petitioner. The material was carried in small amounts at various times during the year. No extra trains were run to carry this material and it did not displace any revenue freight. It being within the control of the petitioner, such material was transported at the petitioner's convenience on trains that did not have capacity tonnage. A large part of the material was carried on local freight and branch-line trains that operate with light tonnage. The material averaged 5½ tons per train and constituted .67 of 1 per cent of the total tonnage of freight carried by petitioner during the year. The prevailing tonnage on petitioner's line of railway is east-bound and empty cars must be moved west-bound at all times of the year to supply sufficient cars for east-bound traffic. Approximately one-half of the material transported for construction purposes during the year 1917 was moved west-bound and the cars in which it was carried would have had to be moved west whether this material was transported or not. The cost of loading and unloading, if performed by petitioner's employes, was not charged to petitioner's operating expense account but to the investment account as a part of the cost of the material. If large quantities of material had to be moved a work train was run for that purpose, the expense of which was charged to the investment account. In such cases no part of the overhead expense of operating the railway was charged to the work train.

12. The petitioner claimed a deduction of $59,409,664.35 for ordinary and necessary expenses incurred in the maintenance and operation of its business and properties during the year 1917. The Commissioner reduced the deduction claimed by the petitioner in the amount of $422,677.80, and in the determination of the proposed deficiency for that year added that amount to the income of the petitioner.

*Federal fines paid by petitioner.*

13. During the year 1917 the petitioner incurred penalties for violating Federal statutes or customs regulations, as follows:

| | |
|---|---:|
| Violation of Safety Appliance Acts | $3, 388. 17 |
| Violation of Hours of Service Act | 517. 63 |
| Violation of 28-Hour Live Stock Act | 536. 22 |
| Violation of customs regulations | 145. 00 |
| | 4, 587. 02 |

14. These violations were the result of negligence or inadvertence on the part of petitioner's employes.

15. Compared with other years, the amounts paid in 1917 were not unusual either in character or amounts.

16. The respondent reduced the amount claimed by the petitioner for ordinary and necessary expenses for the year 1917 in the amount of $4,587.02, and in the determination of the proposed deficiency for that year added that amount to the income of the petitioner.

*Federal fine paid by Great Northern Express Co. (an affiliated corporation).*

17. The Great Northern Express Co. is a corporation organized under the laws of the State of Minnesota. During the year 1918 all of its capital stock was owned by the petitioner, and the petitioner filed a consolidated income-tax return for the year 1918 for itself and the Great Northern Express Co. and paid the tax assessed upon such consolidated return.

18. During the year 1918 the Great Northern Express Co. received a shipment of freight, consigned in bond, and transferred it to the Adams Express Co. The latter company delivered it direct to the consignee, in violation of the customs regulations, and was required by the customs authority to pay a penalty of $28, one-half of which was assumed by the Great Northern Express Co. because of the difficulty of ascertaining which company was at fault.

19. This payment resulted from negligence of the Great Northern Express Co. in failing to keep its records in such a manner that the error would not occur.

20. The Commissioner reduced the amount claimed by the petitioner for ordinary and necessary expenses for the year 1918 in the amount of $14 and in the determination of the proposed deficiency for that year added that amount to the income of the petitioner.

*Interest due from Spokane, Portland & Seattle Railway Co.*

21. During all of the years 1917, 1918, and 1919 the petitioner and the Northern Pacific Railway Co. owned in equal shares the entire capital stock of the Spokane, Portland & Seattle Railway Co., amounting to $40,000,000 par value. This stock was acquired at par.

22. During the same period the petitioner held first and refunding bonds of the Spokane, Portland & Seattle Railway Co. in the amount of $36,855,000. The Northern Pacific Railway Co. held bonds to the amount of $31,855,000, and the Northwestern Improvement Co., a subsidiary of the Northern Pacific Railway Co., held bonds to the amount of $5,000,000.

23. During the same period the petitioner, the Northern Pacific Railway Co., and the Northwestern Improvement Co. held notes of the Spokane, Portland & Seattle Railway Co. in varying amounts and had open accounts with that company representing advances made from time to time.

24. The bonds, notes, and advances bore interest at various rates. The interest due the petitioner on these obligations for the years in question was as follows:

|  | 1917 | 1918 | 1919 |
|---|---|---|---|
| On bonds | $1,474,200.00 | $1,474,200.00 | $1,474,200.00 |
| On notes | 92,872.59 | 45,383.35 | 42,449.53 |
| On advances | 5,027.48 | 201.33 | 1,577.58 |
| Total | 1,572,100.07 | 1,519,784.68 | 1,518,227.11 |

25. No part of the interest due on these obligations was paid during the years 1917, 1918, and 1919.

26. The Spokane, Portland & Seattle Railway Co. had never earned the interest on its obligations. No interest had been paid prior to 1917, but notes had been taken in payment of interest due for certain years prior to 1917. The payment of such interest was not assured by past experience, guaranty, anticipated provision or otherwise.

27. The "classification of income, profit and loss, and general balance sheet accounts for steam roads," prescribed by the Interstate Commerce Commission in accordance with section 20 of the Act to Regulate Commerce, effective July 1, 1914, and in effect during the years 1917, 1918, and 1919 provides what Account No. 514 shall include:

*Income from Funded Securities.*—This account shall include interest on bonds and other funded securities and on debenture stocks of other companies the income from which is the property of the accounting company, whether such securities are owned by the accounting company and held in its treasury, or

deposited in trust, or are controlled through lease or otherwise. Interest accrued shall not be credited prior to actual collection unless its payment is reasonably assured by past experience, guaranty, anticipated provision, or otherwise.

28. In compliance with the foregoing provision the petitioner did not accrue in its income accounts interest due from the Spokane, Portland & Seattle Railway Co. for the years 1917, 1918, and 1919 for the reason that the same was not paid and payment was not reasonably assured by past experience, guaranty, anticipated provision, or otherwise. It made entries upon its books, however, debiting a deferred asset account and crediting a deferred liability account for the amount of the interest, in order that it might have a record of the amount.

29. On December 31, 1917, 1918, and 1919 the assets and liabilities of the Spokane, Portland & Seattle Railway Co., in condensed form, were as follows:

|  | Dec. 31, 1917 | Dec. 31, 1918 | Dec. 31, 1919 |
|---|---|---|---|
| ASSETS |  |  |  |
| Investment in road and equipment | $59,962,532.42 | $60,301,347.04 | $60,439,494.09 |
| Investments in affiliated companies | 34,772,308.46 | 34,525,223.98 | 34,740,223.98 |
| Other investments | 1,465,398.73 | 1,455,327.47 | 1,470,235.70 |
| Current assets | 2,149,358.25 | 226,856.22 | 235,315.25 |
| Deferred assets | 4,470,732.93 | 7,919,834.76 | 9,765,268.22 |
| Unadjusted debits | 19,931,985.14 | 20,809,870.82 | 21,837,048.48 |
| Total assets | 122,752,315.93 | 125,238,460.29 | 128,487,585.72 |
| Debit balance in profit and loss (excess of liabilities plus capital stock over assets) | 110,29,176.38 | 12,994,013.37 | 14,644,498.42 |
| To balance | 133,781,492.31 | 138,232,473.66 | 143,132,084.14 |
| LIABILITIES |  |  |  |
| Capital stock | 40,000,000.00 | 40,000,000.00 | 40,000,000.00 |
| Long term debt | 77,628,855.28 | 76,711,936.77 | 76,858,990.99 |
| Interest unpaid | 8,953,000.00 | 11,901,400.00 | 14,849,800.00 |
| Other current liabilities | 925,177.21 | 8,647.41 | 26,127.10 |
| Deferred liabilities | 53,029.19 | 3,034,667.53 | 3,383,848.36 |
| Unadjusted credits | 6,221,430.63 | 6,575,821.95 | 8,013,317.69 |
| Total liabilities | 133,781,492.31 | 138,232,473.66 | 143,132,084.14 |

30. The item "Investments in affiliated companies" represented investments in the stocks, bonds, and notes of and advances made to the following affiliated companies:

Oregon Electric Railway Co.
Oregon Trunk Railway Co.
Pacific & Eastern Railway Co.
United Railways Co.
Great Northern Pacific Steamship Co.

31. During the years in question the capital stock plus the liabilities of these affiliated companies exceeded their assets by the following amounts:

|                                   | Dec. 31, 1917 | Dec. 31, 1918 | Dec. 31, 1919 |
|-----------------------------------|---------------|---------------|---------------|
| Oregon Electric Ry. Co            | $845,947.48   | $1,330,585.29 | $1,714,020.87 |
| Oregon Trunk Ry. Co               | 2,037,124.45  | 2,392,060.10  | 2,741,831.70  |
| Pac. & Eastern Ry. Co             | 811,916.12    | 938,163.89    | 1,037,709.04  |
| United Railways Co                | 2,206,080.57  | 2,515,997.28  | 2,826,583.02  |
| Great Northern Pacific S. S. Co   | 663,916.76    | 707,873.15    | 726,246.46    |
| Total                             | 6,564,985.38  | 7,884,679.71  | 9,046,391.09  |

The outstanding capital stock of the above-named companies on December 31, 1917, 1918, and 1919 was as follows:

Oregon Electric Railway Co_____ $2,530,000
Oregon Trunk Railway Co_____ 10,000,000
Pacific & Eastern Railway Co_____ 500,000
United Railways Co_____ 3,000,000

The capital stock of the Great Northern Pacific Steamship Co. at the close of 1917 was $4,578,800, and at the close of 1918 and 1919 $325,000.

During the year 1919 the Pacific & Eastern Railway Co. passed into the hands of a receiver and was liquidated with a loss to the Spokane, Portland & Seattle Railway Co. of $1,704,066.29. During the same year the Great Northern Pacific Steamship Co. was liquidated with a loss to the Spokane, Portland & Seattle Railway Co. of $760,228.25.

32. The respondent held that the interest due the petitioner from the Spokane, Portland & Seattle Railway Co. for the years 1917, 1918, and 1919 constituted taxable income for those years and in the determination of the proposed deficiency for those years added the following amounts to the income of the petitioner:

1917_____ $1,572,100.07
1918_____ 1,519,784.68
1919_____ 1,518,227.11

33. During 1921 substantial payments having been received from the Spokane, Portland & Seattle Railway Co. as a result of its settlement with the United States, the petitioner accrued in 1921 all of this interest for prior years, but in the year 1923 made a reversal entry by reason of a ruling of the Interstate Commerce Commission that its regulations did not justify the accrual. The net effect of these entries is that interest from this debtor has not appeared in the petitioner's income statements except when and as collected.

*Interest due from Glacier Park Hotel Co.*

34. During all of the year 1917 the entire capital stock of the Glacier Park Hotel Co. of the par value of $1,500,000 was owned by the Washington & Great Northern Townsite Co. During the same

period the entire capital stock of the latter company was owned by the petitioner.

35. Prior to December 31, 1917, the petitioner made loans and advances to the Glacier Park Hotel Co. both for construction purposes and to meet operating deficits.

36. These loans and advances bore interest and during the year 1917 such interest amounted to $29,558.61.

37. No part of this interest has ever been earned or paid. The payment of such interest was not assured by past experience, guaranty, anticipated provision, or otherwise.

38. In compliance with the rule of the Interstate Commerce Commission referred to in finding No. 27, the petitioner did not accrue in its income account interest due from the Glacier Park Hotel Co. for the year 1917 for the reason that the same was not paid and payment was not reasonably assured by past experience, guaranty, anticipated provision, or otherwise. It made entries upon its books, however, debiting a deferred asset account and crediting a deferred liability account for the amount of the interest, in order that it might have a record of the amount.

39. The Glacier Park Hotel Co. owns and operates the hotels located in Glacier National Park. It began operation in 1913. On December 31, 1917, its assets and liabilities, in condensed form, were as follows:

ASSETS

| | |
|---|---:|
| Property account | $1, 944, 111. 74 |
| Current assets | 11, 003. 11 |
| Material accounts | 32, 640. 14 |
| Total assets | 1, 987. 754. 99 |
| Debit balance in profit and loss (excess of liabilities over assets) | 832, 334. 32 |
| To balance | 2, 820,.089. 31 |

LIABILITIES

| | |
|---|---:|
| Capital stock | 1, 500, 000 .00 |
| Working liabilities | 586, 476. 74 |
| Interest due Great Northern Ry | 72, 461. 81 |
| Depreciation accrued | 347, 220. 90 |
| Deferred liabilities | 313, 929. 86 |
| Total liabilities | 2, 820, 089. 31 |

40. The respondent held that the interest due the petitioner from the Glacier Park Hotel Co. for the year 1917 constituted taxable income for that year and in its determination of the proposed deficiency for that year added the sum of $29,558.61 to the income of the petitioner.

*Interest due from South Butte Mining Co.*

41. During all the year 1917 the entire capital stock of the South Butte Mining Co. of the par value of $50,000 was owned by the petitioner.

42. Prior to December 31, 1917, the petitioner made advances to the South Butte Mining Co. to the amount of $74,704.59.

43. These advances bore interest and during the year 1917 such interest amounted to $4,504.12.

44. Of this amount the sum of $3,518.94 was not earned by the South Butte Mining Co. and has never been paid. The payment of such interest was not assured by past experience, guaranty, anticipated provision, or otherwise.

45. In compliance with the rule of the Interstate Commerce Commission referred to in finding 27, the petitioner did not accrue in its income account interest due from the South Butte Mining Co. in the amount of $3,518.94, for the reason that the same was not paid, payment was not assured by past experience, guaranty, anticipated provision, or otherwise, and there was no possibility of receiving it. It made entries upon its books, however, debiting a deferred asset account and crediting a deferred liability account for the amount of the interest, in order that it might have a record of the amount.

46. On December 31, 1917, the assets and liabilities of the South Butte Mining Co. were as follows:

ASSETS

| | |
|---|---:|
| Property accounts | $102,027.18 |
| Investment in Reno Copper & Silver Mining Co. and South Butte Development Co. | 25,945.27 |
| Current assets | 153.84 |
| Deferred assets | 332.23 |
| Total assets | 128,458.52 |
| Debit balance in profit and loss (excess of liabilities over assets) | 1,903.32 |
| To balance | 130,361.84 |

LIABILITIES

| | |
|---|---:|
| Capital stock | $50,000.00 |
| Advances due Great Northern Ry | 74,704.59 |
| Current liabilities | 1,153.13 |
| Unpaid interest | 4,504.12 |
| Total liabilities | 130,361.84 |

47. The respondent held that the interest due the petitioner from the South Butte Mining Co. for the year 1917, in the amount of $3,518.94, constituted taxable income for that year and in the determination of the proposed deficiency for that year added the sum of $3,518.94 to the income of the petitioner.

*Interest due from the Washington & Great Northern Townsite Co.*

48. During all of the year 1917 the entire capital stock of the Washington & Great Northern Townsite Co. of the par value of $50,000 was owned by the petitioner.

49. Prior to January 1, 1917, the petitioner had loaned the Washington & Great Northern Townsite Co. the sum of $1,500,000, evidenced by a note for $1,095,000 dated May 16, 1914, and one for $405,000 dated November 24, 1914.

50. These notes read as follows:

$1,095,000.00                                              MAY 16, 1914

On demand after date, Washington & Great Northern Townsite Company promises to pay to the order of Great Northern Railway Company

One million and ninety-five thousand and . . . no/100 Dollars at the General Offices of Great Northern Railway Company, St. Paul, Minnesota, with interest at the rate of 6% per annum from the date hereof.

Attest:

    L. E. KATZENBACH
        *Secretary*

              WASHINGTON & GREAT NORTHERN TOWNSITE CO.
          By RALPH BUDD,
              *President.*

$405,000.00                                          NOVEMBER 24, 1914

On demand after date, Washington & Great Northern Townsite Company promises to pay to the order of Great Northern Railway Company

Four hundred and five thousand and . . . No/100 Dollars at the General Offices of Great Northern Railway Company, St. Paul, Minnesota, with interest thereon at the rate of 6% per annum until paid.

Value received.

Attest:

    L. E. KATZENBACH
        *Secretary.*

              WASHINGTON & GREAT NORTHERN TOWNSITE CO.
          By JAMES T. MAHER,
              *Vice-President.*

51. During the year 1917 the interest on these notes amounted to $90,000. No part of this interest has ever been paid. During the year 1917 the operations of the Townsite Company resulted in a loss of $22,061.20, exclusive of this interest. Up to December 31, 1917, the operations of the Townsite Company had resulted in a loss of $1,273.25 exclusive of interest.

52. In the year 1917 the Townsite Company accrued the interest on these bonds amounting to $90,000 and also accrued interest to the amount of $14,085.58 on unpaid interest on these notes. The accrual of interest on unpaid interest was reversed in 1922, leaving only the interest on the notes.

53. In compliance with the rule of the Interestate Commerce Commission referred to in finding No. 27, the petitioner did not accrue in its income account interest due from the Washington & Great Northern Townsite Co. for the year 1917 for the reason that the same was not paid and payment was not reasonably assured by past experience, guaranty, anticipated provision, or otherwise. It made entries upon its books, however, debiting a deferred asset account and crediting a deferred liability account for the amount of the interest, in order that it might have a record of the amount.

54. On December 31, 1917, the assets and liabilities of the Washington & Great Northern Townsite Co., in condensed form, were as follows:

### ASSETS

| | |
|---|---:|
| Property account | $278,730.43 |
| Investment in affiliated companies | 1,500,000.00 |
| Current assets | 34,675.62 |
| Deferred accounts | 23,237.61 |
| Total assets | 1,836,643.66 |
| Debit balance in Profit and Loss (excess of liabilities over assets) | 165,635.34 |
| To balance | 2,002,279.00 |

### LIABILITIES

| | |
|---|---:|
| Capital stock | $50,000.00 |
| Notes and advances due Great Northern Ry | 1,571,122.74 |
| Interest accrued | 338,845.17 |
| Other current liabilities | 42,311.09 |
| Total liabilities | 2,002,279.00 |

55. The respondent held that the interest due the petitioner from the Washington & Great Northern Townsite Co. for the year 1917, in the amount of $90,000, and also interest on unpaid installments of interest in the amount of $14,085.58, constituted taxable income of the petitioner for that year, and in the determination of the proposed deficiency for that year added the sum of $104,085.58 to the income of the petitioner.

### *Depreciation on equipment of petitioner.*

56. During the years 1917, 1918, and 1919 the petitioner scrapped or otherwise disposed of certain units of equipment which cost $1,739,783.60.

57. The fair market value of such equipment as of March 1, 1913, was $735,030.82.

58. The depreciation sustained by such equipment between March 1, 1913, and date of sale or other disposition was $111,443.62, as follows:

| | |
|---|---:|
| 1917 | $32, 583. 85 |
| 1918 | 43, 748. 65 |
| 1919 | 35, 111. 12 |
| | 111, 443. 62 |

59. In computing the loss sustained from the sale or other disposition of such equipment the petitioner used as the basis the fair market value of such equipment as of March 1, 1913, less the depreciation sustained after that date.

60. The respondent made no change in the computation of the loss sustained from the sale or other disposition of such equipment.

### Depreciation on boats of Glacier Park Hotel Co.

61. The Glacier Park Hotel Co. is a corporation organized under the laws of the State of Minnesota. During the year 1919 all its capital stock was owned by the petitioner, and the petitioner filed a consolidated income-tax return for that year on behalf of itself and the Glacier Park Hotel Co. and paid the taxes assessed upon the said return.

62. In the fall of 1913 the Glacier Park Hotel Co. acquired 28 row boats at a cost of $1,702.97. In September, 1919, these row boats were destroyed and there was no salvage.

63. The depreciation actually sustained on these row boats between the date of acquisition and the date of retirement was $540.75.

64. In its income-tax return for the year 1918 the Glacier Park Hotel Co. computed the loss sustained on these row boats by deducting from the cost thereof depreciation sustained between date of acquisition and date of retirement and entered in its return a deductible loss of $1,162.22.

### Depreciation on property of Cottonwood Coal Co.

65. The Cottonwood Coal Co. is a corporation organized under the laws of the State of Minnesota. During the years 1918 and 1919 all of its capital stock was owned by the petitioner, and the petitioner filed consolidated income-tax returns for those years on behalf of itself and the Cottonwood Coal Co. and paid the taxes assessed upon the said returns.

66. During the year 1914 the Cottonwood Coal Co. acquired a cement and sand house at a cost of $499.83. In December, 1918, these facilities were destroyed. No salvage was recovered. The amount of depreciation actually sustained on said cement and sand house

between date of acquisition and date of retirement was $74.97. In its income-tax return for the year 1918 the Cottonwood Coal Co. computed the loss by deducting from the original cost the depreciation accrued subsequent to date of acquisition, namely, $74.97.

67. During the year 1914 the Cottonwood Co. also acquired a boiler house and some fire hose at a cost of $518.74. These were destroyed during October and December, 1919, and no salvage was recovered. In its income-tax return for the year 1918 the Cottonwood Company computed its loss from the destruction of these facilities by deducting from the cost thereof the depreciation sustained subsequent to date of acquisition, namely, $160.71.

### Depreciation on facilities of Somers Lumber Co.

68. The Somers Lumber Co. is a corporation organized under the laws of the State of Minnesota. During the years 1918 and 1919 all of its capital stock was owned by the petitioner, and the petitioner filed consolidated income-tax returns for those years on behalf of itself and the Somers Lumber Co. and paid the taxes assessed upon said returns.

69. Subsequent to March 1, 1913, the Somers Lumber Co. acquired certain facilities at a cost of $1,330.30. These facilities were destroyed during the year 1918 and no salvage was recovered. Between the date of acquisition and date of retirement the depreciation actually sustained on such facilities was $173.70.

70. In its income-tax return for the year 1918 the Somers Lumber Co. computed its loss from such destruction by deducting from the cost of such facilities the depreciation that accrued subsequent to acquisition, namely, $173.70.

71. Prior to March 1, 1913, the Somers Lumber Co. acquired certain facilities at a cost of $15,317.89. Between the date of acquisition and March 1, 1913, the depreciation actually sustained on such facilities amounted to $5,203.69. The fair market value of such facilities on March 1, 1913, was $10,114.20.

72. Subsequent to March 1, 1913, the Somers Lumber Co. acquired certain facilities at a cost of $115,325.70. These facilities, together with those referred to in finding No. 71, were destroyed in the year 1919, the salvage recovered amounting to $58,859.23.

73. The depreciation actually sustained on such facilities subsequent to date of acquisition, together with the depreciation subsequent to March 1, 1913, on facilities referred to in finding No. 72, amounted to $56,357.31.

74. In its income-tax return for the year 1919 the Somers Lumber Co. computed its loss from such facilities by deducting from the cost or March 1, 1913, value the depreciation that accrued subsequent to the basic date, namely, $56,357.31.

*Loss on stock of Spokane & Inland Empire Railroad Co.*     .

75. Between May 5, 1906, and November 4, 1909, the petitioner acquired 34,652½ shares of common stock of the Spokane & Inland Empire Railroad Co. (referred to as the Inland Company) at a cost of $1,863,415, or an average of $53.77 per share; also 10,833½ shares of preferred rights of the same company at a cost of $975,015, or an average of $90 per share. The par value of each class of stock was $100 per share.

76. In the year 1909 the Northern Pacific Railway Co., through its subsidiary, the Northwestern Improvement Co., acquired an equal amount of such common stock and preferred rights at an average cost of $54.24 per share for the common stock and $97.80 per share for the preferred rights.

77. The Spokane & Inland Empire Railroad Co. owned and operated an electric railroad 212 miles long with lines running from Spokane, Wash., to Couer d'Alene, Idaho, with branches to Hayden Lake and Liberty Lake and a main line to Colfax, Wash., and a branch line to Moscow, Idaho. It owned a street car line in Spokane, and had a water power and power plant which furnished the electricity for the railroad and also for sale commercially.

78. The total amount of capital stock outstanding was 100,000 shares of common stock and 64,091 shares of preferred rights. The preferred rights had no voting power. The combined holdings of the petitioner and the Northern Pacific Railway Co. constituted 69.30 per cent of the total voting stock.

79. At the time the stock was purchased the Inland Company was quite prosperous and had a very good passenger business. Its lines reached into wheat and timber country and it was believed that they would furnish considerable traffic for the main lines of the petitioner and of the Northern Pacific. At Spokane it connected with the Oregon-Washington Railroad & Navigation Co. and the Spokane International Railway, a Canadian Pacific connection. A little later the Chicago, Milwaukee & St. Paul Railway Co. also built into Spokane. The business originating on the Inland Company could also move out of Spokane over these lines in competition with the petitioner and the Northern Pacific.

80. By means of the control exercised through the ownership of stock, the petitioner and the Northern Pacific diverted to themselves a large amount of traffic that might otherwise have been moved over competing lines. Prior to the World War the Inland Company was a valuable feeder to the parent companies, but the changed conditions brought about by the war reduced its value.

81. The net earnings of the Spokane & Inland Empire Railroad Co. for the six years ended June 30, 1912, were as follows:

| Year ended June 30— | Net earnings | Deficit |
|---|---|---|
| 1907 | $253,950.95 | |
| 1908 | 95,553.71 | |
| 1909 | 145,497.80 | |
| 1910 | 24,892.33 | |
| 1911 | | $131,701.11 |
| 1912 | | 70,167.76 |
| | 519,894.79 | 201,868.87 |

The average net earnings for the above period were $53,004.32. During the year ended June 30, 1907, a dividend of $91,940 was declared and paid from income. During the next fiscal year a dividend of $114,065 was declared and. paid from surplus. There were no dividends declared or paid thereafter. On March 1, 1913, the books of the company showed assets to the amount of $26,133,· 840.24, and liabilities, exclusive of stock, of $9,508,285.13, leaving a surplus for stock of $16,625,555.11, which would indicate a book value for the stock of $101.32 per share. The surplus of the company at March 1, 1913, according to its balance sheet, was $216,455.11 This balance sheet contains no reserve for depreciation, but indicates depreciable assets in the form of equipment alone in the amount of $1,886,760.72. At December 31, 1918, there was a deficit of $2,525,354.38.

82. The balance sheet at June 30, 1913, showed as follows:

#### ASSETS

| | |
|---|---|
| Cost of road | $17,782,056.39 |
| Cost of equipment | 1,827,111.98 |
| General expenditures | 467,595.10 |
| Stocks owned | 96,285.00 |
| Property rights and franchise | 5,087,899.47 |
| Cash and current assets | 393,247.76 |
| Advances to proprietary affiliated and controlled companies | 129,294.27 |
| Sinking and other special funds | 23,484.86 |
| Unextinguished discount on capital stock | 311,737.00 |
| Deferred debit items | 4,967.04 |
| Total | 26,123,678.87 |

#### LIABILITIES

| | |
|---|---|
| Capital stock preferred | $6,409,100.00 |
| Capital stock common | 10,000,000.00 |
| Funded debt | 4,806,500.00 |
| Current liabilities | 121,035.43 |
| Unfunded debt | 4,170,073.14 |
| Taxes accrued | 279,742.89 |
| Interest on funded debt accrued | 38,311.81 |
| Miscellaneous interest accrued | 101,491.92 |
| Deferred credit items | 9,772.87 |
| Reserves | 14,584.60 |
| Surplus | 173,066.21 |
| Total | 26,123,678.87 |

There is no evidence that the asset account "Property rights and franchises," in the amount of $5,087,899.47, represents any outlay on the part of the company.

83. On September 21, 1911, the Public Service Commission of the State of Washington, pursuant to law, and after due hearing and the taking of testimony, found that the cost to reproduce that portion of the property of the Inland Company used and necessary for railroad purposes on January 1, 1911, was $17,575,899, in addition to which it owned considerable real estate in the City of Spokane not used or necessary for railroad purposes; that the property was substantially constructed and reasonably well maintained and the average age of the entire plant was four years.

84. During the time that the Inland Company was controlled by the petitioner and the Northern Pacific Railway Co. those companies made advances to it of $5,168,931.95 for the purpose of enabling it to meet its interest payments and other obligations.

85. The stock of the Inland Company was not listed on the New York Stock Exchange or any other well recognized exchange. During the months of February and March, 1913, no sales of the stock of the Inland Company were reported. During both months the bid price of the common stock was $10 per share and the asked price $20 per share, and the bid price of the preferred rights was $30 per share and the asked price $40 per share.

86. During the year 1918 the stock of the Inland Company held by the petitioner became worthless and was written off on the books of the petitioner as a total loss.

87. The fair market value as of March 1, 1913, of the common stock of the Inland Company was $30 per share. The fair market value as of March 1, 1913, of the preferred rights was $60 per share. Petitioner's deductible loss on this transaction was $1,689,585.

88. The respondent computed the petitioner's loss on this stock on the basis of the value as of March 1, 1913, of $10 per share for common stock and $30 per share for preferred rights and in the determination of the proposed deficiency added $2,166,900 to petitioner's income for the year 1918. The petitioner computed its loss on the basis of the cost of the stock at time of purchase and claimed a deduction of $2,838,430.

*Profit or loss on sale of various small parcels of real estate.*

89. During the year 1918 the petitioner sold several parcels of real estate. The cost, the March 1, 1913, value, and the selling price of the several parcels were as follows:

| Description | Cost | Value, Mar. 1, 1913 | Selling price |
|---|---|---|---|
| 39.14 acres Helena, Mont | $5,000.00 | $2,500.00 | $1,174.20 |
| 2 lots Sioux City, Iowa | 803.72 | 4,000.00 | 4,000.00 |
| 7.6 acres Pennock, Minn | Not shown. | 610.80 | 610.80 |
| ²⅜ acre Pelican Rapids, Mich | 51.00 | 125.00 | 125.00 |
| 3.05 acres Yukon, Wash | 161.13 | 250.00 | 250.00 |

The respondent determined profits upon the sale of these parcels of property of $1,173.20, $799.07, $610.80, $74.00, and $88.87, respectively.

### Contributions towards the construction of spur tracks, etc.

90. During the years 1918 and 1919 certain individuals and corporations made contributions to the petitioner toward the cost of constructing spur tracks or farm crossings desired by the contributors. In some instances instead of contributing cash they furnished the labor or material used in the construction of such spur tracks or farm crossings. The amount of such contributions, including the estimated value of the labor and material furnished by such persons or corporations was $28,116.04 in 1918 and $19,128.98 in 1919.

91. The spur tracks and farm crossings, for which such contributions were made, were constructed under contracts which provided that the title to the property constructed would remain in the petitioner, although a part or all of its cost would be paid by the person applying for the same.

92. The "classification of investment in road and equipment," prescribed by the Interstate Commerce Commission, provided as follows:

2. ITEMS TO BE CHARGED—To these accounts [accounts for Investment in Road and Equipment] shall be charged the cost of original road, original equipment, road extensions, additions and betterments; also the estimated values at time of acquisition of right of way and other road and equipment property donated to the carrier * * *

COSTS shall be actual money costs to the carrier where a portion of the funds expended by the carrier has been obtained through donations by states, municipalities, individuals, or others, as deductions on account of such donations shall be made in stating the costs. * * *

93. The "classification of income, profit and loss and general balance sheet accounts," prescribed by the Interstate Commerce Commission, effective July 1, 1914, contained the following rules:

606. Donations—This account shall include amounts creditable to surplus of cash or its equivalent in estimated money value at the time of acquisition of lands or other properties donated by individuals or companies for the con-

struction or acquisition of property. It shall include donations made by individuals and companies in connection with the construction of new lines for the purpose of compensating the carrier for loss anticipated during the early period of operations. Any advances made by individuals or companies with absolute or conditional provisions or partial or complete reimbursement shall not be considered a donation prior to the fulfillment of all conditions, and then only to the extent to which the liability for reimbursement is nullified or negatived. Prior to such determination the amount received shall be credited to balance sheet account No. 778 " other unadjusted credits."

Note: Donations made by States, municipalities and other public corporations as their contributions toward the construction or acquisition of property, shall be included in balance sheet account No. 754, grants in aid of construction.

606. Surplus Appropriated for Investment in Physical Property.

This account shall include amounts definitely appropriated from surplus, to be applied for the construction or acquisition of new lines and extensions of additions to and betterments of property, the cost of which is includible in balance sheet No. 705, " Miscellaneous Physical Property," and also the amount of donations in aid of construction, made by individuals and companies, not subject to distribution as dividends.

94. In compliance with the foregoing rule of the Interstate Commerce Commission, the petitioner charged to its investment account the entire cost of spur tracks or farm crossings built at the request of individuals or corporations where the title to such spur tracks and farm crossings remained in the petitioner. Included in such cost was the estimated value of labor and material furnished by such individuals and corporations. The amount contributed by such individuals and corporations, including the estimated value of labor and material furnished by them, was credited to the account under " Profit and Loss " styled " 606. Donations," and at the same time an entry was made transferring the amount so credited to " Donations " from " Profit and Loss " to "Appropriated Surplus."

95. The individuals or corporations that contributed to the construction of such spur tracks or farm crossings paid the same lawful tariff rates for shipments of freight as did other shippers who had not contributed toward the cost of constructing spur tracks or farm crossings.

96. The respondent included the amounts contributed by such individuals and corporations, as well as the estimated amount of labor and material furnished by such individuals and corporations toward the construction of such spur tracks and farm crossings, in computing the taxable income of the petitioner and in the determination of the proposed deficiency added to the income of petitioner for the years 1918 and 1919 the sums of $28,116.04 and $19,128.98, respectively.

*Compensation due petitioner under Federal Control Act.*

97. On December 30, 1918, a contract was entered into between William G. McAdoo, Director General of Railroads, acting on behalf of the United States and the President, and the petitioner, the Duluth

Terminal Railway Co., Minneapolis Western Railway Co., Minneapolis Belt Line Co., Great Northern Terminal Railway Co., Great Northern Equipment Co., Duluth & Superior Bridge Co., Watertown & Sioux Falls Railway Co., Montana Eastern Railway Co., and the Great Falls & Teton County Railway Co.

Section 8(a) of that agreement read—

SEC. 8(a) The annual compensation guaranteed to the Companies under Section 1 of the Federal Control Act shall be the sum of twenty-eight million, seven hundred seventy-one thousand, three hundred sixty dollars and seventy-eight cents ($28,771,360.78) during each year and pro rata for each fractional part of a year of Federal control, subject, however, to any increase or decrease in the standard return hereafter made by the Commission as provided in paragraph (d) of the preamble of this agreement.

Compensation paid by the Director General under this agreement, including that provided for in paragraph (d) of this section, or arising from any other source, shall be paid to the Company (taxpayer); and the Company, after retaining such part thereof as it may be entitled to retain, shall distribute the remainder to the parties entitled thereto.

98. The amount of annual compensation to which the petitioner and its affiliated corporations, with which it filed consolidated returns for 1918 and 1919, was entitled under this agreement, as shown by certificates of the Interstate Commerce Commission to the President, was as follows:

| | |
|---|---:|
| Great Northern Railway Co | $28,666,681.07 |
| Duluth & Superior Bridge Co | 33,048.48 |
| Duluth Terminal Railway Co | 23,830.40 |
| Watertown & Sioux Falls Railway Co | 51,339.50 |
| Minneapolis Western Railway Co. (Def.) | 3,538.67 |
| Total | 28,771,360.78 |

99. The petitioner and its affiliated corporations accrued as income and reported for taxation in its income-tax returns for each of the years 1918 and 1919 the sum of $28,771,360.78 due from the Director General under said agreement.

100. From time to time during the period of Federal control the Director General made advances to the petitioner on account of such compensation. At the time of final settlement a balance of approximately $15,000,000 remained unpaid on account of such compensation.

101. On April 22, 1921, an agreement was entered into between the Director General of Railroads and the companies named in the agreement of December 30, 1918, providing for final settlement of all accounts between the Director General and those companies. Under this agreement the Director General agreed to pay to the petitioner in final settlement the sum of $6,500,000, subject to further adjustment upon the issuance by the Commission of its final certificate as to the "standard return" of the companies. Neither at the time of

entering into said agreement nor prior or subsequent thereto was any agreement reached as to the application of the payment of $6,500,000, or any part thereof, to any item or items or any statement or statements of claim made by either the Great Northern Railway Co. or the Director General.

102. On January 5, 1922, the Interstate Commerce Commission issued its final certificate restating the standard return of the Great Northern Railway Co. and fixing its annual compensation at $28,613,045.30. The evidence does not show the annual compensation finally fixed for the Great Northern Railway Co. and its affiliated subsidiaries, but the amount alleged by the respondent is $28,680,866.93.

103. On January 25, 1922, the Interstate Commerce Commission issued the following instructions to railroad companies whose property had been under Federal control:

INTERSTATE COMMERCE COMMISSION

Washington.

At a session of the INTERSTATE COMMERCE COMMISSION, Division 4, held at its office in Washington, D. C., on the 25th day of January, A. D. 1922.

The Commission having under consideration the procedure to be observed by carriers whose systems of transportation were under Federal control, in accounting for the amounts receivable from or payable to the Director General of Railroads in final settlement for the use and operation of their property during Federal control:

It is ORDERED, That the following accounting procedure to be observed by such carriers:

(1) All ledger accounts with the United States Railroad Administration covering items adjusted in such final settlement shall be considered as liquidated and shall be closed.

(2) Items on which the amount of settlement may be mutually agreed upon between the Director General and the carrier whether or not previously recorded in the accounts, shall be recorded in the accounts in accordance with the effective accounting regulations on basis of settlement agreed upon.

(3) Any difference between amounts adjusted in accordance with the foregoing and the amount collected or paid by the carrier in such final settlement shall be cleared to profit and loss account 607, " Miscellaneous credits," or 621 " Miscellaneous debits," as may be appropriate, provided that the use of profit and loss in clearing balances shall not operate to relieve carriers of the observance of classification rules applying to additions to and retirement of physical property and the maintenance of adequate depreciation reserves for equipment.

By the Commission—Division 4.

GEORGE B. McGINTY,
Secretary.

104. Complying with these instructions, the petitioner accounted for the $6,500,000 received from the Director General by crediting the same to its profit and loss account in the year 1921, after first closing off to that account all accounts with the Director General as

shown by its books, including the account covering " unpaid compensation."

105. The respondent computed the taxable income of the petitioner for the years 1918 and 1919 on the basis of the final certificate made by the Interstate Commerce Commission under date of January 5, 1922, and in the determination of the proposed deficiency reduced the taxable income for each of those years in the sum of $90,493.85.

*Interest due from Director General under Federal control agreement.*

106. The contract between the Director General and the petitioner dated December 30, 1918, covering operations during Federal control contained the following provision:

SEC. 4(a) * * * Balances of the above accounts shall be struck quarterly on the last days of March, June, September and December of each year, and the cash balance found on such adjustments to be due either party shall be then payable and, if not paid, shall bear interest at the rate of 6 per cent per annum, unless the parties shall agree upon a different rate. * * *

107. No quarterly balances were struck between the Director General and the petitioner and the only settlement of accounts made between the parties was the final settlement evidenced by agreement dated April 22, 1921.

108. In its accounts for the year 1919 the petitioner accrued as income the sum of $1,570,199.75, representing the estimated amount of interest due the petitioner from the Director General under the contract of December 30, 1918, and reported the same for taxation as taxable income for the year 1919.

109. As stated before, no agreement was reached between the petitioner and the Director General as to any particular item or items contained in any statement of claim made by either the petitioner or the Director General, or as to the application of the payment of $6,500,000 to any such item or items.

110. Complying with instructions from the Interstate Commerce Commission, petitioner accounted for the $6,500,000 received from the Director General by crediting that sum to its profit and loss account for the year 1921 after first closing off to that account all accounts with the Director General, including the account representing interest due from the Director General.

111. The respondent computed the amount of interest due the petitioner from the Director General for the year 1918 at $693,005.39 and for the year 1919 at $351,764.86, these computations being based upon the allocation made by the Director General of the lump-sum settlement of $6,500,000, and in the determination of the proposed deficiency the respondent added $693,005.39 to the taxable income of the petitioner for the year 1918 and reduced the taxable income for the year 1919 in the sum of $1,218,434.89.

11340°—28——19

*Interest due from the Farmers Grain & Shipping Co.*

112. The Brandon, Devils Lake & Southern Railway Co. is a corporation organized under the laws of the State of North Dakota. At all times during the years 1918 and 1919 its entire capital stock was owned by the petitioner, and the petitioner filed consolidated income-tax returns for itself and the Brandon Company for the years 1918 and 1919 and paid the tax assessed upon such consolidated returns.

113. At all times during the years 1918 and 1919 the Brandon Company owned 60.51 per cent of the capital stock of the Farmers Grain & Shipping Co., a corporation organized under the laws of the State of North Dakota (referred to as the Farmers Company).

114. The Farmers Company owned and operated a line of railroad about 52 miles in length, extending from Devils Lake to Rock Lake, and it operated a line owned by the Brandon Company about 13.05 miles in length, extending from Rock Lake to Hansboro, N. Dak.

115. The Farmers Company was organized by the farmers located in the region north of Devils Lake, North Dakota, for the purpose of giving these farmers transportation. Its line intersects that of the petitioner at Devils Lake, N. Dak.

116. During the years 1918 and 1919 the line of the Farmers Company was operated as a branch line of the petitioner as a part of its Dakota Division, under the jurisdiction of the superintendent of that division. With the exception of its president, the officers of the Farmers Company are the same as those of the petitioner.

117. During the years 1918 and 1919 the Brandon Company owned all of the outstanding bonds of the Farmers Company, amounting to $438,000 par value.

118. The interest due the Brandon Company on such bonds amounted to $21,900 for each of the years 1918 and 1919.

119. No part of the interest due on these bonds was paid during the years 1918 and 1919.

120. For a great many years prior to 1918 the Farmers Company had neither earned nor paid the interest on these bonds.

121. In compliance with the rule of the Interstate Commerce Commission referred to in finding No. 31, the Brandon Company did not accrue in its income accounts interest due from the Farmers Company for the years 1918 and 1919, for the reason that the same was not paid and payment was not reasonably assured by past experience, guaranty, anticipated provision, or otherwise. The income-tax returns of the Brandon Company were made in accordance with its books.

122. On December 31, 1918, and 1919 the assets and liabilities of the Farmers Company, in condensed form, were as follows:

|  | Dec. 31, 1918 | Dec. 31, 1919 |
|---|---|---|
| ASSETS |  |  |
| Investment in road and equipment | $653,981.98 | $652,910.91 |
| Other investments | 1,056.52 | 1,056.52 |
| Current assets | 867.20 | 1,993.58 |
| Deferred assets | 41,016.55 | 44,044.70 |
| Unadjusted debit | 5,555.30 | 11,116.27 |
| Total assets | 702,477.55 | 711,121.98 |
| Debit balance in profit and loss (excess of liabilities over assets) | 198,187.01 | 224,287.25 |
| To balance | 900,664.56 | 935,409.23 |
| LIABILITIES |  |  |
| Capital stock | 200,000.00 | 200,000.00 |
| Funded debt unmatured | 438,000.00 | 438,000.00 |
| Unpaid interest due Brandon Company | 183,650.00 | 205,550.00 |
| Other current liabilities | 36,453.54 | 49,350.25 |
| Deferred liabilities | 11,802.15 | 12,971.48 |
| Unadjusted credits | 30,758.87 | 29,537.50 |
| Total liabilities | 900,664.56 | 935,409.23 |

123. The interest due the Brandon, Devils Lake & Southern Railway Co. from the Farmers Grain & Shipping Co. for the years 1918 and 1919 was not collectible when it became due.

124. The fact that this interest was uncollectible was ascertained by and known to the petitioner during the years 1918 and 1919.

125. The respondent held that the interest due the Brandon, Devils Lake & Southern Railway Co. from the Farmers Grain & Shipping Co. for the years 1918 and 1919 constituted taxable income for those years and in the determination of the deficiency for those years the respondent added the sum of $21,900 to each of the years 1918 and 1919.

*Alleged sale of steamship by the Northern Steamship Co.*

126. The Northern Steamship Co. is a corporation organized under the laws of the State of Wisconsin, and during all of the years 1918 and 1919 its entire capital stock was owned by the petitioner and the petitioner filed consolidated income-tax returns on behalf of itself and the Northern Steamship Co. for the years 1918 and 1919 and paid the taxes assessed upon such consolidated returns.

127. On November 27, 1918, the Northern Steamship Co. entered into what was purported to be an agreement with the Davie Shipbuilding & Repairing Co., Ltd., referred to as the Davie Company, for the sale of the Northern Steamship Co.'s steamship *Northland* for $600,000. This agreement read as follows:

MEMORANDUM OF AGREEMENT, entered into this 27th day of November, 1918, between the NORTHERN STEAMSHIP COMPANY, owner of the steamer NORTHLAND, hereinafter called the Owner, and the DAVIE SHIPBUILDING AND REPAIRING COMPANY, LTD., of Levis, Canada, hereinafter called the Repairer.

I. The Owner agrees to turn over the Northland to the Repairer immediately, as and where she now lies at the port of Buffalo, with all apparel and appurtenances now on board, together with spare propeller blades, furniture, blankets, linen, and all other furnishings and supplies originally on board the Northland and now on storage, it being understood, however, that the owner is not required to replace any supplies or equipment which have been consumed or have passed out of its possession.

II. The Repairer agrees, at his own expense, to do all work and furnish all materials necessary to make over said steamer, the work done on the vessel to be of such nature as to insure that when the repairs are completed she will be a mechantable vessel, whether cargo or passenger, free and clear of all liens whatsoever.

III. The Owner represents that it has obtained the consent of the United States Shipping Board to the sale and transfer of said steamer to the Repairer, and agrees to execute at once a bill of sale for the transfer of the title in said steamer, free and clear of all liens whatever, to the Davie Shipbuilding and Repairing Company, Ltd., which bill of sale, together with the evidence of such consent of said Shipping Board, shall be deposited in escrow with Haight, Sandford & Smith, and shall be delivered to the Repairer upon payment to said Haight, Sandford & Smith of Six Hundred Thousand Dollars ($600,000), it being agreed that said sum shall be paid by the Repairer as soon as it is in funds from the sale of said steamer, but, in any event, whether the steamer is sold or not, said sum shall be paid not later than August 1, 1919.

IV. The Repairer agrees to pay all expenses incident to ownership which may accrue after possession is given by the owner, and to keep the steamer insured against all marine and fire risks from the date upon which it obtains possession of the steamer, said insurance being in the sum of Six hundred thousand dollars ($600,000), payable to the Owner or Repairer as interest may appear, steamer to be valued in said policies at Six hundred thousand dollars ($600,000) and policies to be apropved and effected by Parsons & Eggert.

V. The Repairer shall have the right to sell such materials and equipment covered by this contract as he may deem advisable, which materials and equipment if sold shall be sold by the Repairer, at the best prices obtainable and satisfactory to Edgerton Parsons. The proceeds of such sales shall be deposited with Haight, Sandford & Smith, to be applied, in so far as they are sufficient, to the payment of the cost of repairs. Repair bills which are to be paid out of the said proceeds of salvage sales shall be approved by the surveyor representing the Classification Society in charge of the work, and, as so approved, may be paid by Haight, Sandford & Smith without further proof that they are correct.

VI. If by August 1, 1919, the sum of Six hundred thousand dollars ($600,000) has not been paid by the Repairer, the Owner without prejudice to any other right, shall have the right to take possession of the steamer and sell her at public auction (after giving the Repairer at least ten days' written notice of the time and place fixed for such auction), and hold the Repairer for any deficit which may result from the said sale, the Repairer to be charged not only with the purchase price of Six hundred thousand Dollars ($600,000) but also with all costs, expenses and fees incident to the sale and all liens and charges, if any, arising after the date of this contract, to which the steamer may be subject; or the Owner shall account to the Repairer for any sum which may be obtained above Six hundred thousand dollars ($600,000), after paying the above mentioned costs, expenses, etc. It is understood and agreed, however, that if the completion of the work to be done by the Repairer is delayed, or prevented by

the act of God, restraint of Princes, Rulers, or Peoples, strikes, fire, or any other like or different cause over which the Repairer has no control, then the date of payment shall be extended beyond August 1, 1919, for the like period that the work is so delayed. The Repairers shall give the owner immediate notice on the happening of any of the above causes for which he will claim delay.

NORTHERN STEAMSHIP COMPANY,

By RALPH BUDD

DAVIE SHIPBUILDING AND REPAIRING COMPANY, LTD.

By C. A. BARNARD, *President*.

Addendum to Memorandum of Agreement between Northern Steamship Company and Davie Shipbuilding and Repairing Company, Ltd., executed November 27th, 1918.

If the consent of the Shipping Board to the sale and transfer of the North-land should be revoked while the bill of sale is held in escrow, the Repairer shall have the right to require the owner to sell and transfer her to any American or other buyer approved by the Shipping Board whom the Repairer may nominate, and the Repairer shall receive the total sum realized by such sale above Six hundred thousand dollars ($600,000). If, however, it shall prove impossible, within thirty (30) days after the completion of the work or the extended period hereinafter provided for, to find an American or other buyer approved by the Shipping Board who will pay a sum sufficient to cover the cost of making over said steamer plus the Six hundred thousand dollars ($600,000) to be paid the Owner, then the Owner shall pay the Repairer the cost of the work done and cost of materials furnished, together with insurance premiums and incidental expenses, and shall assume any unpaid bills for labor and material on account of repairs, and shall be entitled to take the steamer over for its own use. The cost of labor and materials shall be based upon current market rates, approved by Henry Black or other surveyor in his office, the intent of the parties being that, in the event of the revocation of the consent of the Shipping Board and the taking over of the steamer by the Owner, the Repairer shall be put in the same position as if the work upon the steamer had been undertaken in the first instance as a regular repair job, on a day's work basis, and the Repairer shall have interest at the rate of six per cent per annum upon any unpaid balance, said interest being figured from the end of each month upon the amount due at that time. In the event that an American or other buyer approved by the Shipping Board cannot be found within the thirty (30) days mentioned in this paragraph, the Repairer may have an extension of that period by thirty (30) days more, upon waiving its right to interest upon the unpaid balance of the cost of the work, during the period of such extension. In computing the cost of the work done and the materials furnished, the Owner shall be entitled to credit for all salvage.

The Repairer agrees to give the Owner at the end of each calendar month during repairs a statement of the work done and the percentage which the work done bears to the total repairs. The completion of the work referred to in this addendum shall be interpreted to mean the date when the Classification Society shall deem the vessel to be in a fit condition for classification. The Repairer agrees to apply for classification for this vessel at the earliest date when it is possible to apply for the classification and to use due diligence in obtaining the classification after the application therefor.

NORTHERN STEAMSHIP COMPANY,

By RALPH BUDD

DAVIE SHIPBUILDING AND REPAIRING COMPANY, LTD.

By C. A. BARNARD, *President*.

128. In accordance with the provisions of this purported agreement a bill of sale covering the steamship was deposited in escrow pending the payment of the purchase price.

129. Payments on the purchase price were received from C. A. Barnard, as follows: August 2, 1919, $100,000; August 21, 1919, $50,000; October 16, 1919, $50,000—total $200,000. The steamship was delivered to one Captain Green who took possession and gave a receipt in the name of the Davie Company.

130. Thereafter the Davie Company repudiated the agreement on the ground that said Barnard was without authority to execute the same.

131. Thereafter, on January 6, 1920, the Northern Steamship Co., the Davie Shipbuilding & Repairing Co., and C. A. Barnard, individually, entered into an agreement reading as follows:

MEMORANDUM OF AGREEMENT, entered into this 6th day of January, 1920, by and between the NORTHERN STEAMSHIP COMPANY, owner of the steamer Northland, (hereinafter called the Steamship Company), a corporation organized and existing under the laws of the State of Wisconsin, party of the first part, the DAVIE SHIPBUILDING & REPAIRING COMPANY, LIMITED, (hereinafter called the Davie Company), a corporation organized and existing under the laws of the Dominion of Canada, party of the second part, and CHARLES A. BARNARD, individually, of Montreal, Canada, party of the third part:

WHEREAS, on the 27th day of November, 1918, a contract was entered into by the Steamship Company for the sale of the steamer Northland to the Davie Company, which contract was signed "Davie Shipbuilding & Repairing Company, Ltd., by C. A. Barnard, President"; and

WHEREAS, after the execution of said agreement, one Captain Green took possession of the steamer Northland and gave a receipt therefor in the name of the Davie Company; and

WHEREAS, the Davie Company claims that Charles A. Barnard had no authority to enter into said agreement on its behalf and that said Captain Green had no authority to accept possession on its behalf, and disclaims all liability under said contract and any interest in or under or by virtue thereof; and

WHEREAS the repudiation of said contract by the Davie Company was not disclosed to the steamship Company by the Davie Company nor by said Barnard, and was not, in fact, known to the Steamship Company; and

WHEREAS said Barnard personally made certain payments to the Steamship Company on account of the purchase price, said payments aggregating Two hundred thousand dollars ($200,000), which payments the Steamship Company at the time understood were in fact made on behalf of the Davie Company, whereas both the Davie Company and Barnard now claim that these payments were made on account of Barnard personally; and

WHEREAS the steamer Northland has been cut in two, for the purpose of taking her from Buffalo to Quebec, and the forward part of the steamer is now at Sorel and the after part is at Coteau, in the Soulange Canal; and

WHEREAS all of the parties of this agreement desire to accomplish an adjustment of the differences which have arisen as the result of the making of said contract and the repudiation thereof by the Davie Company.

Now, THEREFORE, THIS AGREEMENT WITNESSETH:

1. The Davie Company hereby specifically disclaims any interest in or under or by virtue of the contract of November 27th, 1918, a copy of which is annexed hereto, marked Schedule A and made a part of this agreement. The Davie Company further represents that a resolution has been duly passed by its board of directors, a certified copy of which is annexed hereto and marked Schedule B.

II. Charles A. Barnard hereby

(1) Agrees to and does hereby renounce any claim against the Steamship Company and/or against the steamer Northland and/or any interest in said steamer which he personally might have under said contract and/or by reason of the payments which he personally has made on account of the purchase price or otherwise, and hereby releases the Steamship Company from any and all claims arising in any way from said contract or from said payments or in any other way connected with the steamer Northland;

(2) Represents (which representation has been acted upon by the Steamship Company and has induced the making of this contract) that the Northland, at the time of the execution of this agreement, is free from any liens in connection with anything that has happened since the 27th day of November, 1918, and in particular that no lien or claim against said steamer exists in favor of the Montreal Transportation Company and/or the Cowls Shipyards, and, in proof of said representation said Barnard has, prior to the delivery of this contract, submitted receipted bills and other documents showing payment for certain work and materials furnished by the Cowls Shipyards, and showing also payment to the Montreal Transportation Company for towage services rendered the Northland, and hereby warrants that said bills cover all work and materials furnished by said Cowls Shipyards and all towage services rendered by the Montreal Transportation Company, and that there is nothing due or to become due to either of the two concerns above mentioned or to any other individual or corporation which now is or hereafter can become a lien upon said steamer.

(3) Agrees to assume and arrange for the payment of Twenty-eight thousand four hundred sixty-one 02/100 dollars ($28,461.02) now due Marsh & McLennan (Marine) for premiums on insurance policies issued to cover the Northland since November 27th, 1918, which premiums have been paid by Marsh & McLennan (Marine) to the underwriters to maintain the insurance on said vessel, and said Barnard hereby sells to the Steamship Company all pig iron now on board both halves of said vessel, at the actual cost thereof, and hereby directs the Steamship Company to pay the same to Marsh & McLennan (Marine) on account of the amount due to them for insurance premiums as aforesaid; and, to secure the payment of the balance thereof, said Barnard agrees, simultaneously with the execution and delivery of this agreement, to deliver to Andrew Haydon, of 19 Elgin Street, Ottawa, a mortgage running to said Andrew Haydon for the amount of said unpaid balance, said mortgage to cover a parcel of about one hundred and eighty (180) acres of land situated on the east end of the island of Montreal (which land said Barnard represents belongs to him individually, free and clear except only for a purchase money mortgage amounting to Twenty Thousand Dollars), said mortgage to become due in six (6) months from date and to draw six per cent (6%) interest until paid;

(4) Agrees that all articles which have been removed from the steamer Northland since November 27th, 1918, shall be returned to the Steamship Company, and, in particular, that all articles taken from said steamer and now stored at Levis or Quebec shall be delivered to a responsible warehouse

in Quebec, to be designated by the Steamship Company, and that a warehouse receipt shall be taken therefor in the name of the Steamship Company and delivered to Andrew Haydon, above referred to, within ten (10) days after the execution of this contract.

(5) Agrees that all insurance policies now outstanding, covering the steamer Northland, may be altered so as to make loss, if any, payable solely to the Steamship Company.

III. In consideration of the above, the Steamship Company agrees, upon the execution of this contract, to retake possession of the steamer Northland and to purchase the aforesaid pig iron and to release and acquit the Davie Company and Charles A. Barnard individually of and from all claims and demands rising from or in any way connected with the contract of November 27th, 1918, and/or arising from any action or thing done by said Barnard in connection with said steamer.

IV. The bill of sale and all other papers now held in escrow by Haight, Sandford & Smith shall be returned to the Steamship Company.

IN WITNESS WHEREOF, two counterparts of this contract have been executed by the Steamship Company, said execution having been duly authorized by its board of directors as per certified copies of the resolution of the board thereto attached, and three counterparts have been executed by the Davie Company and Charles A. Barnard, said execution thereof by the Davie Company having been duly authorized by the board of directors of the Davie Company as per certified copies of the resolution of its board of directors thereto attached; execution and delivery of this contract to be fully effected by exchange of said counterparts.

132. The Northern Steamship Company did not accrue any profit from this transaction during the year 1918, but accrued in 1919 the sum of $21,735.71, being one-third of the estimated profit from the sale.

133. The respondent determined that the Steamship Northland was sold in the year 1918 at a profit of $65,207.13 and in the determination of the deficiency for the years 1918 and 1919 added the sum of $65,207.13 to the income of the petitioner for the year 1918 and deducted the sum of $21,735.71 from its income for the year 1919.

### Taxes due from Director General.

134. At all times during the years 1918 and 1919 the railroads of the petitioner and the Duluth Terminal Railway Co., the railroad and bridge of the Duluth & Superior Bridge Co., and the railroad of the Watertown & Sioux Falls Railway Co. were in the possession and control of the President under the Federal Control Act.

135. On December 30, 1918, the companies enumerated above executed the agreement with the Director General of Railroads, referred to in finding No. 97. Said agreement provided:

6(a) * * * All taxes commonly called war taxes which have been or may be assessed against the Companies under the act of Congress entitled "An act to provide revenue to defray war expenses, and for other purposes" approved October 3, 1917, or under any act in addition thereto or in amendment thereof * * * shall be paid by the Companies.

6(c) The Director General shall either pay out of revenues derived from railway operation during the period of Federal Control or shall save the Companies harmless from all taxes lawfully assessed under Federal or any other governmental authority for any part of said period on the property under such control, or on the right to operate as a carrier, or on the revenues derived from operation, and all other taxes which under the accounting rules of the Commission in force December 31, 1917, are properly chargeable to "railway tax accruals," except the taxes and assessments for which provision is made in paragraph (a) of this section. The Director General shall pay or save the companies harmless from the expense of all suits respecting the classes of taxes payable by him under this agreement.

136. In determining additional taxes due from the petitioner the respondent computed taxes for the year 1918 at the rate of 12 per cent, and for the year 1919 at the rate of 10 per cent.

### Depreciation of Allouez Bay Docks.

137. During the years 1918 and 1919 the petitioner was the owner of certain dock property at Allouez Bay, Wis., consisting of docks Nos. 1, 2, 3, and 4, with office buildings, power house and miscellaneous structures and machinery appurtenant thereto.

138. The reasonable allowance for the depreciation, exhaustion, wear and tear of said dock property amounted to $231,126.36 for the year 1918 and $230,449.50 for the year 1919.

139. Section 5 of the Federal control agreement dated December 30, 1918, provided that the Director General should pay to the petitioner the amount requisite to make good the depreciation that accrued during Federal control on property taken over by the Director General.

140. During the period of Federal control the petitioner did not charge any depreciation on such ore docks to its operating expense accounts in its income-tax returns for those years or claim any deduction for depreciation, exhaustion, wear or tear thereon, but instead charged to the Director General the sum of $231,126.36, representing depreciation that accrued during the year 1918, and $230,449.50, representing depreciation that accrued during the year 1919.

141. On April 22, 1921, the petitioner entered into an agreement with the Director General known as the final settlement agreement, under which the Director General agreed to pay the petitioner the sum of $6,500,000 in settlement of all accounts between the petitioner and the Director General.

142. By the method of accounting prescribed by the Interstate Commerce Commission the petitioner applied this sum in payment of all its accounts against the Director General, including said depreciation for the year 1918, in the amount of $231,126.36, and said depreciation for the year 1919, in the amount of $230,449.50.

143. The books of the Director General show that out of the sum of $6,500,000 the sum of $42,439.95 was applied in payment of said depreciation for the year 1918 and the sum of $41,763.09 in payment of depreciation for the year 1919 instead of the amounts charged to the Director General by the petitioner.

### Assessment paid to Association of Railway Executives.

144. The Association of Railway Executives is a voluntary association maintained by the railway companies. On October 16, 1919, the Chairman of the Association of Railway Executives issued a circular letter, a copy of which was received by the petitioner, announcing an assessment to be levied for the purpose of providing funds for carrying out the purposes of the Association. One-half of the assessment was to become due November 1, 1919, one-quarter on February 1, 1920, and one-quarter on May 1, 1920. This circular letter announced that the proposed assessment was made up of the following items:

1. Advertising and publicity in connection with pending legislation and the return of the roads to private operation_____ $1,000,000
2. Bureau of Railway Economics (1920) _____ 90,000
3. Railway Corporate Engineers Association (1920) _____ 10,000
4. Railroad Corporate Accounting Conference (1920) _____ 10,000
5. President's Conference Committee on Federal Valuation (1920) _ 200,000
6. Association of Railway Executives for general and legal expenses (1920) _____ 290,000

Total_____ 1,600,000

145. On November 15, 1919, petitioner paid to the Association $28,776.91, being one-half of the total assessment levied against the petitioner.

OPINION.

SMITH: The points in issue will be discussed in the order of the findings of fact.

1. *Transportation for Investment-Cr.*—In its original income-tax return for 1917 the petitioner claimed a deduction from gross income for ordinary and necessary expenses of $59,403,357.05. It filed an amended return for that year in which it increased the deduction for expenses by the amount of $6,307.30, representing the refunds made under the Minnesota rate case decision, making the amount claimed $59,409,664.35. Included in this amount was $422,677.80 which stood upon its books as a credit to the account "Transportation for Investment-Cr." It now claims that the correct amount of its deduction for expenses is $59,367,864.90 or $41,799.45 less than the amount claimed upon its original return, said $41,799.45 repre-

senting in its opinion the correct credit to "Transportation for Investment-Cr."

The petitioner's books of account for the year 1917 were kept in accordance with the uniform system of accounts prescribed by the Interstate Commerce Commission. Under the provisions of such system of accounts railroad companies are permitted to charge to construction cost a reasonable allowance for the cost of transporting men and materials for construction projects over their own lines in transportation service trains. The Interstate Commerce Commission does not fix the amount which may thus be charged to construction but merely places a maximum limit thereon. Such maximum limit is one per cent per man mile for employees and six mills per ton mile for materials. In keeping its books of account for 1917 the petitioner made the maximum charge permitted by the Interstate Commerce Commission and in effect capitalized $422,677.80 as the cost of transporting men and materials engaged in construction work on its revenue trains. It here contends that at the time the charge was made the petitioner had not made an exact determination of cost of such charge and that such cost should have been computed at $41,799.45 instead of at $422,677.80 and that the respondent erred in disallowing the deduction from gross income of the difference between these two amounts, or $380,878.35.

The petitioner's general manager, a man with 32 years' experience in petitioner's operating department, testified that men are transported to construction work on the ordinary passenger trains; that no extra trains are run or extra cars put on to carry them; that no extra service is performed for them; that during the year 1917 the men so transported were equal to 3,220,609 men transported one mile; that they averaged approximately 1 man to every 4 passenger trains and constituted approximately .48 of 1 per cent of the total passengers carried on such trains; that at all times many more passengers could have been carried on such trains without increasing the number of trains or cars run. The witness testified that in his opinion the operating expenses of the petitioner would not have been reduced if these men had not been carried on these passenger trains. He also testified that company material, including construction material, was transported in such a way as not to require the use of additional trains; that a great deal of it was transported by local way-freights and branch-line trains which usually ran with light tonnage; that the company controlled movement of construction material so as to move it on trains that did not have full tonnage; that construction material for a given job was accumulated from time to time at a station near the job until a sufficient quantity had been received to justify putting on a work train by which the material was transported to the place where it

was to be used; that the entire cost of the work train was then charged to the job. He also testified that the prevailing tonnage on petitioner's line of railroad was east-bound and that empty cars had to be used west-bound at all times of the year to supply sufficient cars for east-bound traffic; that in the case of construction material moved west-bound the only extra service performed was the haul of the material itself as the cars would otherwise be moving light; that no extra service was performed in the handling of construction material; that the material was usually loaded by the firm from which it was bought, or, if loaded by the petitioner's employees, the work was done by store department men whose time was not charged to operating expenses; that the material was also unloaded by store department employees; that during the year 1917 construction material equivalent to 65,076,446 tons moved one mile was transported in the ordinary commercial trains of the petitioner; that this material was carried in small amounts at various times during the year; that it averaged 5½ tons per train and constituted .67 of 1 per cent of the total tonnage of freight carried by the petitioner during the year. He stated that it was his opinion that if such construction material had not been transported by the petitioner during the year 1917 the cost of maintenance of way or maintenance of equipment would not have been reduced, except in the case of repairs to freight cars. In connection with repairs to freight cars he stated that it was his opinion that 60 per cent of such repairs varied with the volume of traffic and 40 per cent was due to weather conditions and natural deterioration; also that if such construction material had not been moved, traffic expenses, the cost of operating dining cars, hotels, stock yards, etc., and the general expenses of the company such as salaries of its general officers, accounting department expense, etc., would not be changed; that the only items of expense classified as transportation expenses which would be affected would be fuel for yard locomotives and fuel for train locomotives.

Upon the basis of the testimony given by petitioner's general manager, a cost analyst, with twelve years' experience in railroad work, testified that the operating expenses of the petitioner for the year 1917 had been increased not more than $41,799.45 by the transportation of employes engaged in and construction material used in additions and improvements in transportation service trains. The method of the computation is detailed and no useful purpose would be served by setting it forth here, except that is should be noted that in the determination of the revised estimate only freight-car repairs, fuel for yard locomotives, water for yard locomotives; fuel for train locomotives and water for train locomotives and train power produced have been taken into consideration.

The classification accounts prescribed by the Interstate Commerce Commission permit the petitioner to charge to capital " a fair allowance representing the expense to the carrier of such transportation in transportation service trains over the carrier's own line." The petitioner's operating expenses claimed as a deduction from gross income were $422,677.80 in excess of the amount shown as its operating expenses in returns made to the Interstate Commerce Commission. The petitioner now admits that $41,799.45 of the $422,677.80 was properly disallowed as a deduction from gross income by the respondent. We think that the evidence does not show that any part of the $422,677.80 was a proper deduction from gross income. That amount was the estimate made by the petitioner of the portion of its operating expenses which should be charged to capital when it made up its accounts for 1917. Apparently in the making of that estimate other cost factors were taken into consideration in addition to those used in computing the revised estimate of $41,799.45. The latter figure has been computed upon the basis of the *additional cost* to the petitioner of transporting men and materials engaged in and used in construction work, but the account " Transportation for Investment—Cr." does not apparently have reference entirely to the additional cost to the petitioner of transporting men and materials so engaged. In our opinion, a part of the wear and tear of the train equipment of the rails, ties, etc., may be properly capitalized when men and materials for construction work are transported in transportation service trains. The evidence adduced does not convince us that the real cost to the petitioner of this transportation is the amount of $41,799.45. The disallowance of the deduction of $422,677.80 is therefore approved.

2. *Federal fines paid by petitioner for 1917 and Federal fines paid by Great Northern Express Co., an affiliated company, for 1918.*— This issue relates to the deductibility from gross income of amounts paid as fines or penalties for violation of certain Federal regulatory statutes. The petitioner claims the deduction of these amounts as ordinary and necessary expenses. The respondent has disallowed the deduction of these amounts,

The amounts claimed as deductions for the year 1917 are as follows:

| | |
|---|---|
| Violation of Safety Appliance Acts | $3, 388. 17 |
| Violation Hours of Service Act | 517. 63 |
| Violation of 28-Hour Live Stock Act | ·536. 22 |
| Violation of customs regulations | 145. 00 |
| | 4, 587. 02 |

The amount of the disallowance for the year 1918 is $14, which represents one-half of a penalty paid by the Great Northern Express Co., an affiliated corporation, for a violation of a customs regulation

by the Adams Express Co. The Great Northern Express Co. contributed one-half of the penalty because of the difficulty of ascertaining which company was at fault.

The Safety Appliance Acts consist of an act passed March 2, 1893, with various amendments, making it unlawful for a railway company to operate cars or locomotives with certain specified defects over its line. (27 Stat. 531; 29 Stat. 85; 32 Stat. 943; 36 Stat. 298; 36 Stat. 1397.) The provisions of the Acts with respect to the beginning of the time of enforcement after the enactment are liberal.

The Hours of Service Act was an act passed March 4, 1907, and amended May 4, 1916, making it unlawful for a railroad company to employ telegraph operators, enginemen, trainmen or switchmen more than a given number of hours without rest. (34 Stat. 1415; 39 Stat. 61.) The Act contains the liberal proviso that it does not apply:

* * * In any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of causes not known to the carrier or its office or agent in charge of such employee at the time the said employee left a terminal which could not have been foreseen.

The 28-Hour Live Stock Act (34 Stat. 607) was an act passed June 29, 1906, making it unlawful for railway companies to confine live stock in cars more than 28 hours without unloading them for feed and rest, unless the shipper gave his written consent, in which case they could be confined for 36 hours without being given an opportunity to obtain feed and rest. The act contains a proviso that the penalty or fines shall not be imposed if the carrier is prevented by storm or other accident or unavoidable causes which could not be anticipated or avoided by the exercise of due diligence and foresight.

We think that all the operating expenses of a railroad company must ordinarily be regarded as " ordinary and necessary expenses " and deductible from gross income. We note, however, that the Interstate Commerce Commission has not classified fines of the character of those paid by the petitioner as operating expenses. They are required to be recorded in account No. 621, "Miscellaneous Debits." It is provided that this account " shall include amounts, not provided for elsewhere, chargeable to Profit and Loss from other accounts, amounts written off in consequence of adjustment, and payments not properly chargeable to the income accounts. * * * Among items which shall be charged to this account are * * * Penalties and fines for violation of the Act to Regulate Commerce, or other Federal laws, but not specifically provided for elsewhere."

Payments of the fines above indicated do not constitute operating expenses under the classification of accounts of the Interstate Commerce Commission. We are of the opinion that they do not constitute

ordinary and necessary expenses deductible from gross income in income-tax returns. Cf. *Sarah Backer et al., Executors*, 1 B. T. A. 214; *Norvin R. Lindheim*, 2 B. T. A. 229; *John Stephens*, 2 B. T. A. 724; *Columbus Bread Co.*, 4 B. T. A. 1126.

3. *Interest due from Spokane, Portland & Seattle Railway Co.; Glacier Park Hotel Co.; South Butte Mining Co.; and Washington & Great Northern Townsite Co.*—This issue involves for 1917 the question of whether or not the petitioner shall be taxed on interest accruing to it upon debts owed to it by the Spokane, Portland and Seattle Railway Co., the Glacier Park Hotel Company, the South Butte Mining Co., and the Washington and Great Northern Townsite Co. in the respective amounts of $1,572,100.07, $29,558.61, $3,518.97, and $104,085.58, and for the years 1918 and 1919 the question of whether it shall take up as income in its income-tax returns interest accruing to it on debts of the Spokane, Portland & Seattle Railway Co. in the respective amounts of $1,519,784.68 and $1,518,-227.11. All of these debtor corporations were nonaffiliated subsidiaries of the petitioner for the years involved.

The petitioner did not include in its accrued income the interest in question because it was not shown upon its books of account as accrued income. The petitioner's books of account are kept in accordance with the requirements of the Interstate Commerce Commission. The "classification of income, profit and loss, and general balance sheet accounts of steam railroads" prescribed by that Commission in accordance with section 20 of the Act to Regulate Commerce, effective July 1, 1914, and in effect during the years 1917, 1918, and 1919, contains the following provision:

*Income from funded securities.*— * * * Interest accrued shall not be credited prior to actual collection unless its payment is reasonably assured by past experience, guaranty, anticipated provision or otherwise.

The petitioner did not, however, wish to lose sight in its bookkeeping records of the fact of the accrual of the interest upon the obligations of the above named companies and therefore recorded in a balance sheet account, designated " Other Deferred Assets," the interest which accrued yearly upon these obligations and counterbalanced such entry by a corresponding entry on the liability side of its balance sheet designated " Other Deferred Liabilities." During the tax years involved the petitioner did not record the interest in its income accounts because it was of the opinion that there was no likelihood of its ever collecting the interest. George R. Martin, the petitioner's vice president, and in 1917 its comptroller, testified that during the years 1917, 1918, and 1919 he was familiar with the financial condition of the Spokane, Portland & Seattle Railway Co.; that he received from that company weekly and monthly income accounts and

balance sheets, and went to Portland once or twice to examine their books for the purpose of keeping in touch with their financial requirements. He knew how far behind the Spokane, Portland & Seattle Railway Co. was in its payments. The books of the other debtor companies were kept by the petitioner's comptroller who was also comptroller for these companies. He knew better than anybody else their actual financial condition and possibilities of future collection of the interest accruing. In connection with the interest due from the South Butte Mining Co. the comptroller stated in answer to the question as to why such interest was not accrued as income, "Because there seemed no possibility of collecting it. The company had no income and no operations." It was also testified by officers of the petitioner that there seemed no likelihood that the Spokane, Portland & Seattle Railway Co. would ever pay interest upon its bonds. It was continually operating at a deficit. In the opinion of one of the witnesses the coupons which matured during the taxable years were worth nothing at all. The same condition obtained with respect to the other subsidiaries. The officers of the petitioner in good faith believed that the interest never could be collected. No part of the interest which accrued during the taxable years on any of the companies has ever been paid except a portion of that which accrued on the bonds and other interest-bearing obligations of the Spokane, Portland & Seattle Railway Co. In 1921 this company received a large payment from the United States and a part thereof was used to liquidate certain notes which that company had given to the petitioner in payment of interest which accrued prior to 1917. Based upon conditions existing in 1921, the petitioner accrued upon its books as income interest which had theretofore accrued upon the obligations of the Spokane, Portland & Seattle Railway Co. This treatment was, however, vetoed by the Interstate Commerce Commission and the entry was reversed in 1923 with the result that the interest which accrues upon the obligations of the Spokane, Portland & Seattle Railway Co. is recorded in the income accounts of the petitioner only when collections are actually made.

In justification of his action in holding that the interest which accrued upon the obligations of these subsidiaries was income of the petitioner for the years 1917, 1918, and 1919, as above indicated, the respondent points out that the balance sheets of the debtor corporations for the years involved show assets in excess of liabilities exclusive of capital liabilities; that therefore they have a net worth from which it might have been possible for the petitioner to recover the interest which accrued upon the obligations even though such recoveries would have been at the expense of the petitioner's investment in the capital stock of the corporations. He also argues that

the petitioner keeps its books of account upon the accrual basis; that the requirement of the Interstate Commerce Commission is for the purpose of its proper administration of the affairs of railroads and in effect combines the cash system of accounting with the accrual system; that such practice is not permissible for the purposes of determining income for taxation, and in support of this proposition relies upon *Consolidated Asphalt Co.*, 1 B. T. A. 79; *Clarence Schock*, 1 B. T. A. 528; *Henry Reubel, Executor*, 1 B. T. A. 676. It is the theory of the respondent that the petitioner is required under the income-tax law to report as income the amount of interest which accrued upon interest-bearing obligations held by it for the years 1917, 1918, and 1919, regardless of the requirements of the Interstate Commerce Commission, and that if it ascertained in those years that the interest was not collectible and charged it off from its gross income, the same can be claimed as a deduction from gross income in income-tax returns.

We are satisfied from a careful study of the balance sheets and income accounts of the debtor corporations involved in this issue that the interest owed to the petitioner by these corporations could not have been collected by legal process during the taxable years if at all, without impairment of the principal investment of the petitioner in such companies. The petitioner, with the Northern Pacific Railway Co., owned the capital stock of the Spokane, Portland & Seattle Railway Co. The petitioner and its associated company might conceivably have had a receiver appointed for the Spokane, Portland & Seattle Railway Co. and might possibly have collected principal and interest upon the bonds held by it. But this would have been at the sacrifice of petitioner's and its associate's investment in the stock of these companies. There clearly would have been no income to the petitioner corporation from such proceeding.

Section 13 (d) of the Revenue Act of 1916 provides:

A corporation * * * keeping accounts upon any basis other than that of actual receipts and disbursements, unless such other basis does not clearly reflect its income, may, subject to regulations made by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, make its return upon the basis upon which its accounts are kept, in which case the tax shall be computed upon its income as so returned.

Section 212 (b) of the Revenue Act of 1918 provides:

The net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; * * * or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *

The petitioner kept its accounts upon the basis of the system of accounts prescribed by the Interstate Commerce Commission. It

could not have done otherwise. The question before us is whether the accounts of the petitioner so kept reflect the true income of the petitioner.

We have carefully considered the decisions of the Board above referred to which the respondent relies upon as requiring the petitioner, keeping its books as it does upon an accrual basis under the regulations of the Interstate Commerce Commission, to include in income the interest upon all obligations of the debtor corporations here involved. In *Consolidated Asphalt Co., supra,* we said:

> It would be an obvious distortion to return only the gross income actually received and deduct therefrom both the amounts paid out and the payments anticipated.

In *Henry Reubel, Executor, supra,* it was said:

> In this appeal the taxpayer followed one of the two alternative bases provided by statute for keeping accounts and making returns of income. He claimed a deduction which can only be justified under the other alternative basis. In our opinion, to allow such a deduction would result in a distortion of the result of the income of the taxpayer for the year in question and would lead to the inevitable conclusion that Congress, instead of providing for two alternative bases for reporting income, each complete in itself, provided for alternative bases with respect to the reporting of *items* of income and the taking of *items* of deductions. Such a holding would be inconsistent with the specific language of Congress in sections 200 and 212 and wholly at variance with the obvious intent of Congress that income should be reported in such a manner upon an annual accounting basis as to reflect the truth.

The statute does not lay down two alternative bases for keeping accounts and making returns of income. It simply provides that a corporation keeping accounts upon any basis other than that of actual receipts and disbursements may, subject to regulations, make its returns upon the basis upon which its books are kept " unless such other basis does not clearly reflect its income." We are not therefore primarily concerned with whether the classification of accounts of steam railroads laid down by the Interstate Commerce Commission is an accrual system of accounting or some other system. The only question before us is whether the system reflects the income of the petitioner.

As indicated by the income-taxing statutes, corporations keeping books of account may make their returns upon the basis of actual receipts and disbursements or upon some other basis which truly reflects income. There are two methods of accounting in general use, (1) the cash basis commonly used by individuals and small concerns, and (2) the so-called " accrual basis." Both methods have for their object the same purpose, which is the recording of the financial transactions of a business and the summarizing of the results so as to show the effect of these transactions upon the business.

The principal difference between them is the period of time to which a given transaction is allocated.

Under either method the taxpayer must have before him some definitely ascertained item of income to record before it can be reported and if a given transaction does not correspond to the definition of income then there is no income to record whether the taxpayer keeps its books on a cash or an accrual basis. Where books are kept on the accrual basis there is no requirement that there shall be accrued as income that which may never be received. The position of the respondent in this case carried to its logical conclusion would require a taxpayer keeping its books of account upon the accrual basis to accrue as income interest on bonds held as an investment which it did not collect and which in all probability it never would collect. If the theory of the respondent is correct an insolvent corporation keeping its books of account upon the accrual basis might merely by the purchase of bonds of insolvent corporations upon which interest was neither being earned or paid, easily show a large income.

In our opinion the requirement of the Interstate Commerce Commission that interest accrued on funded securities shall not be credited to income accounts prior to actual collection "unless its payment is reasonably assured by past experience, guaranty, anticipated provision or otherwise," is entirely consistent with a system of accounting which is designed to reflect any company's true income. If the petitioner had kept its accounts in the manner suggested by the respondent it would have reported to the public each year that it had earned income in excess of one million and a half dollars which, as a matter of fact, it had not received and which in all probability it would never receive. Such a system of accounting would not have reflected the petitioner's true income but would have given to its stockholders and the public a false idea of its income.

The respondent does not contend that the petitioner actually had earnings during the taxable years of the interest that accrued upon the interest-bearing obligations of its subsidiaries herein considered. It does contend, however, that it should have accrued the interest upon its books of account and unless it can show that the interest could not be collected by legal process and that the amounts accrued upon its books had been charged off as bad debts, the petitioner is liable to income tax in respect of such interest. Manifestly, the petitioner can not keep its books of account in the manner suggested by the respondent. It is prohibited by the rulings of the Interstate Commerce Commission to set up as income the accrued interest. Therefore it could not have charged the amounts off.

We are of the opinion that the interest upon the interest-bearing obligations of the debtor corporations above enumerated which was not collected during the tax years involved was not taxable income.

4. *Depreciation on equipment of petitioner scrapped or sold; boats of Glacier Park Hotel Co. destroyed; property of Cottonwood Coal Co. destroyed; and facilities of Somers Lumber Co. destroyed or sold.*—Various items involved in this issue do not present for the determination of the Board any question of fact since all of the facts involved are agreed upon by the parties. The only question presented is whether in determining the deduction on account of loss sustained by destruction, sale or scrapping of assets, the March 1, 1913, value or cost subsequent to that date should be reduced by depreciation sustained up to the date of destruction, sale, or scrapping, which depreciation was charged off the petitioner's books of account and presumably claimed as a deduction from gross income in income-tax returns.

The principle involved in this question has heretofore been decided by the Board adversely to the contentions of the petitioner in *Even Realty Co.*, 1 B. T. A. 355. The principle has also been decided adversely to the petitioner in the recent decision of the United States Supreme Court in *United States v. Ludey*, 274 U. S. 295.

5. *Loss on stock of Spokane & Inland Empire Railroad Co.*—This issue is merely one of fact, namely, the value at March 1, 1913, of stock, both preferred and common, of the Spokane & Inland Empire Railroad Co. which became worthless in the hands of the petitioner in 1918. The petitioner wrote off as a loss for that year the entire cost of the stock of the above-named company which it had acquired from 1906 to 1909. The respondent conceded that the stock was worthless in 1918 but did not allow the loss claimed. He allowed a loss based on a March 1, 1913, value of $10 per share for the common stock and $30 per share for the preferred stock. These amounts were the prices which were bid for the stocks as shown by market quotations on or about March 1, 1913. The asked prices, as shown by such quotations, were $20 for the common stock and $40 for the preferred. There were no sales of either class so far as the record shows at or about the basic date. The Spokane & Inland Empire Railroad Co. occupied a unique position with respect to the railroad operations of the petitioner. It was an electric road 212 miles long. It extended into the Coeur d' Alene territory of Idaho, and to certain points in the State of Washington. The road tapped rich wheat and lumbering sections. At the time the stock was acquired it was believed that the road would act as a valuable feeder to the petitioner and to the Northern Pacific Railway Co., which also purchased heavily of the stock. The passenger traffic on the road was heavy for a number of years. The control of the road to a large extent meant the control of traffic

originating in the territory. The petitioner, together with the Northern Pacific Railroad Co., had a controlling interest in the voting stock of the company. We have no doubt that this factor should be taken into account in determining the fair market value as of March 1, 1913. *Phillips* v. *United States*, 12 Fed. (2d) 598.

The petitioner contends that the fair market price or value of its shares of common stock in the Spokane & Inland Empire Railroad Co. on March 1, 1913, was $30 per share for the common stock and $90 per share for the preferred stock. In support of its contention it placed on the stand at the hearing an investment banker who testified that in his opinion the fair market value of the common stock on March 1, 1913, was $30 per share and of the preferred stock $60 per share. Taking into consideration all of the evidence of record we are of the opinion that these values represent the fair market values on March 1, 1913, of the stock held by the petitioner. We therefore determine the fair market value of the petitioner's shares on the basic date and the loss sustained in 1918 to be $1,689,585.

6. *Profit or loss on sales of various parcels of land.*—The sole question involved in this issue is one of fact, namely, the cost and March 1, 1913, value of five parcels of property sold during the year 1918. The respondent has determined an aggregate profit of $2,745.94 from the sale of these parcels, based upon the March 1, 1913, value, whereas the petitioner contends that no taxable profit was realized on the sale of any parcel and that a deductible loss of $1,325.80 was sustained on the sale of 39.14 acres near Helena, Mont. The evidence satisfies us that no taxable profit was sustained upon the sale of any parcel and that an actual loss, as contended for by the petitioner, was sustained upon the sale of the tract of land near Helena. The petitioner is, therefore, entitled to the deduction of a loss of $1,325.80 on these sales.

7. *Contributions towards the construction of spur tracks, etc.*— The question involved in this issue grows out of the acquisition by the petitioner, without cost to it, of facilities such as spur tracks and farm crossings on its right of way constructed at the cost of patrons of the railroad.

It was the practice of this carrier, where an industry located along its tracks desired transportation facilities from its plant, to construct the necessary spur track, take title to so much thereof as lay on its right of way, and require the industry to pay the cost of construction. This item is accounted for under the Interstate Commerce Commission's rule entitled "Account No. 606. Donations." Where the facility was constructed by the industry the cost of construction to the industry was taken upon the petitioner's books either at the exact cost to the industry, or at the estimated cost thereof. The

amount of the contributions, including the estimated value of the labor and material furnished by the industry or persons performing the labor, was $28,116.04 in 1918, and $19,128.98 in 1919. The petitioner did not return these amounts as income in its income-tax returns upon the theory that they did not constitute taxable income within the meaning of the Sixteenth Amendment and the income-tax laws. The respondent has amended the petitioner's returns for these years by including in the gross income the above amounts.

It is the contention of the respondent that all of the tests of income are met in the receipt of these amounts. He argues that the carrier is to furnish service at a point away from the main line and that the industry is to pay the cost of the property to which the carrier gets title; that the consideration given by the road is its service at the point of the spur track; that this is obviously a charge imposed upon the industry over and above tariff rates; that the petitioner's assets are increased by the cost or value of the facility and on such investment the petitioner is entitled to earn a fair return; furthermore, that rights are reserved in the contract to move freight of other industries over such spurs from points beyond the first industry's property into the lines of the carrier.

On behalf of the petitioner, it is argued that the amounts received were not derived from the employment of labor, from capital, or from both combined, and that they do not constitute income as that word has been defined in numerous decisions of the Supreme Court. *Eisner* v. *Macomber*, 252 U. S. 189; *Merchants' Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509; *United States* v. *Phellis*, 257 U. S. 156; *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628; *Bowers* v. *Kerbaugh-Empire Co.*, 271 U. S. 170. The facts in this case are strikingly similar to those which obtained in the *Appeal of Liberty Light & Power Co.*, 4 B. T. A. 155. In that case, the petitioner had entered into four contracts with certain individuals for the construction of transmission lines in territory in which the power company had assumed no franchise obligations. The contracts provided that the title to the lines should be in the power company, but that the individuals should contribute a certain part of the cost of construction. The accounting rules prescribed by the Indiana Public Utilities Commission provided that in such cases the entire cost of construction should be charged to the proper capital account and the amount contributed by the individuals should be credited to an account styled " Donations in Aid of Construction." Relying upon the *Cuba Railroad Co.* decision above cited, we held that such contributions did not constitute taxable income to the power company. There is nothing to distinguish that case from the one under consideration. We there extensively reviewed the authorities upon this subject. In accord-

ance with the rule laid down in that case, we are of the opinion that the petitioner is not liable to income tax in respect of the contributions received in aid of construction during the years 1918 and 1919.

8. *Compensation due petitioner under the Federal Control Act.*— The standard return, or annual compensation based upon the annual average earnings for the " test period," agreed to in the contract of this petitioner and its subsidiaries with the Director General, was $28,774,899.45. By the terms of the contract this was not a final figure, but was subject to correction by increase or decrease as the Commission might determine under the provisions of the preamble of the agreement. This provides for a correction of the tentative standard return to accord with what the Commission might certify after the accounts and reports of the company, used by the Commission in arriving at the standard return, may have been brought into conformity with the accounting rules of the Commission. When the Commission finally certified the standard return it was changed to $28,684,405.60, or $90,493.85 less than that contained in the contract and reported in the returns of the petitioner.

This issue is fully controlled by the principle adopted by the Board in its decision in *Appeal of Illinois Terminal Co.*, 5 B. T. A. 15. All of the facts necessary to a determination of the correct standard return were in existence and capable of ascertainment within the year 1918 and before the year 1919. Under such circumstances the corrected figure is the proper amount to be accrued. *United States* v. *Anderson*, 269 U. S. 422.

9. *Interest due from Director General under Federal control agreement.*—Section 4(a) of the contract of the petitioner with the Director General provided that balances of certain accounts therein and previously mentioned in the contract should be struck quarterly and that such balances should bear interest at a specified rate. The balances in question were not in fact struck. The petitioner accrued nothing on its books in the year 1918 on account of interest on such balances. It, however, accrued in 1919 interest due it by the Director General in the amount of $1,570,199.75. The respondent determined that the interest on such quarterly balances accruable in the year 1918 was $693,005.39 and in the year 1919 was $351,764.86. The petitioner desires to return its income from this source in accordance with its books and to adjust any differences in the year in which it made final settlement with the Director General.

An examination of the contract indicates that all of the facts necessary for a determination of the quarterly balances were in existence and known or capable of being known at the end of each quarter. There is no evidence to indicate that these balances depended upon any contingencies or any basic facts to come into existence in later years. We are of the opinion that this issue is con-

trolled the same as the preceding one by the decision of the Board in *Illinois Terminal Co., supra*. The action of the respondent upon this point is sustained.

10. *Interest due from the Farmers Grain & Shipping Co.*—The petitioner claims affiliation with the Farmers Grain & Shipping Co. If this contention is granted, the action of the respondent by adding to the petitioner's gross income for 1918 and 1919 any amount for interest due it from its subsidiary must be reversed.

The petitioner owned 100 per cent of the capital stock of the Brandon, Devils Lake & Southern Railway, which in turn owned 60.51 per cent of the stock of the Farmers Grain & Shipping Co. The properties of the Brandon and Farmers companies were operated as a unit and as a part of the system of the petitioner.

There is no evidence that the minority of 39.49 per cent of the Farmers Grain & Shipping Co. stock was either owned or controlled by the petitioner, its subsidiaries, its stockholders, or its subsidiary's stockholders. The evidence does not warrant a conclusion that substantially all of the stock of this company was owned directly or controlled through closely affiliated interests, or by a nominee or nominees of the petitioner. We must, therefore, hold that the petitioner was not affiliated with the Farmers Grain & Shipping Co. during either of the years 1918 or 1919. See *Adaskin-Tilley Furniture Co.* v. *Commissioner*, 6 B. T. A. 316.

This makes it necessary to determine whether the petitioner derived any income from the accrual of interest upon the obligations of the Farmers Grain & Shipping Co. The situation here is substantially the same as that considered in the third issue of this proceeding. Under the regulations of the Interstate Commerce Commission the petitioner could not take into income the interest which accrued upon these obligations for the reason that the interest was not paid during the taxable years and the payment was not "reasonably assured by past experience, guaranty, anticipated provision or otherwise." The company was not earning any interest upon its obligations and had not been for many years. The petitioner derived no income from the interest accruable upon bonds of this company during the taxable years and the addition to the reported income of the petitioner of any amount for interest upon these obligations was in error.

11. *Alleged sale of steamship by Northern Steamship Co.*—The contention of the petitioner upon this issue is that there was no sale of the steamship *Northland* by the Northern Steamship Co., an affiliated subsidiary of the petitioner, in 1918; that if it be held, however, that there was a sale in the year 1918 the gain therefrom should be computed upon the installment-sale method and that the only income from the transaction was the $200,000 received from Barnard in 1919. The contention of the respondent upon this point is that one of the

subsidiaries of the petitioner entered into a contract in 1918 for the sale of the steamship *Northland* at a price of $600,000; that if the purchase price had been paid in cash at the date of sale the profit which would have been realized would have amounted to $65,207.13; that the contract of sale was valid; that payments were not to be made in installments and that the profit which actually accrued to it in 1918 was $65,207.13.

The Northern Steamship Co. received no down payments on account of the sale of the steamer *Northland* in 1918. It admits that it received $200,000 in 1919 and confesses that it is liable to income tax in respect of the amount received in 1919. In our opinion this is the only amount of income received by the petitioner from this transaction, and we think, in the circumstances, it was properly allocated by the petitioner to the year 1919.

12. *Taxes due from Director General.*—The issue here raised is whether the petitioner is liable to tax upon its net income at the rates of 12 per cent and 10 per cent for the years 1918 and 1919, respectively, or at the rates of 10 per cent and 8 per cent for those years, respectively. This issue is controlled by the decision of the Board in *New York, Ontario & Western Railway Co.*, 1 B. T. A. 1172. In accordance therewith, it is held that the proper rates applicable are 10 per cent for 1918 and 8 per cent for 1919.

13. *Depreciation on Ore Docks.*—The petitioner submits that if the Board holds that its accounts relating to Federal control operations in 1918 and 1919 should be restated to correspond with the books of the Director General, then its income for the years 1918 and 1919, respectively, should be reduced in the sum of $188,686.41, representing depreciation actually sustained and charged to the Director General, but which the Director General's books show was not assumed or paid by him.

That the depreciation claimed to have been sustained by the petitioner upon its dock property at Allouez Bay, Wis., was actually sustained as claimed is admitted by the respondent's answer. In accordance therewith, the claim of the petitioner with respect to additional depreciation for the years 1918 and 1919 is allowed.

14. *Assessment paid to Association of Railway Executives.*—There was in existence during the year 1919 an association known as the "Association of Railway Executives." On October 16, 1919, the president of that association mailed the president of the petitioner a letter announcing plans for the assessment of $1,600,000 for the support of the association. Included in the letter was a committee report relating to the proposed expenditure by the association of $1,000,000 for the purpose of a publicity campaign to bring pressure to bear upon Congress through the medium of public opinion to enact

legislation favorable to the railroads in connection with the return of the roads to private control and in connection with other legislation affecting the roads.

On November 1, 1919, the president of the association mailed a letter to the petitioner containing a statement that its quota of the entire assessment of $1,600,000 was $57,553.83, of which one-half, or $28,776.91, was due and payable immediately, and that the remaining one-half would be due and payable in two installments during the year 1920. The respondent contends that ten-sixteenths of the amount paid in 1919 should be disallowed as a deduction from gross income on the ground that to this extent the payment to the association was not an ordinary and necessary business expense.

The evidence before the Board does not show how or for what purpose the money collected by the Association of Railway Executives was expended nor to what account or accounts the payment made by the petitioner in 1919 was charged on its books. The record is also silent as to whether the petitioner deducted this payment from its gross income in making its income-tax return for 1919. This issue injected into the proceeding by the respondent is, for lack of proof on his part, decided in favor of the petitioner.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*

STERNHAGEN dissents in part.